1 | Jeremy V. Richards (CA Bar No. 102300)
  | John W. Lucas (CA Bar No. 271038)
2 | PACHULSKI STANG ZIEHL & JONES LLP
  | 10100 Santa Monica Blvd., 13th Floor
3 | Los Angeles, CA 90067
  | Telephone: 310/277-6910
4 | Facsimile: 310/201-0760
  | E-mail: jrichards@pszjlaw.com
5 |          jlucas@pszjlaw.com

6 | Attorneys for Plaintiff David K. Gottlieb,
  | Chapter 11 Trustee of the Estates of Solyman
7 | Yashouafar and Massoud Aaron Yashouafar

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>SOLYMAN YASHOUAFAR and MASSOUD AARON YASHOUAFAR,[1]<br>Debtors. | Case No.: 1:16-bk-12255-GM<br><br>Chapter 11<br>Jointly Administered |
| In re:<br>SOLYMAN YASHOUAFAR,<br>Debtor. | Case No.: 1:16-bk-12255-GM<br>Chapter 11 |
| In re:<br>MASSOUD AARON YASHOUAFAR,<br>Debtor. | Case No.: 1:16-bk-12408-GM<br>Chapter 11 |
| Affects:<br>☑ Both Debtors<br>☐ Solyman Yashouafar<br>☐ Massoud Aaron Yashouafar | |
| DAVID K. GOTTLIEB, as Chapter 11 Trustee for Massoud Aaron Yashouafar and Solyman Yashouafar,<br><br>                    Plaintiff,<br>      v.<br><br>ELKWOOD ASSOCIATES, LLC, FIELDBROOK, INC., CITIVEST FINANCIAL SERVICES, INC., ISRAEL ABSELET, HOWARD ABSELET, CHASE MANHATTAN MORTGAGE COMPANY, QUALITY LOAN SERVICE CORPORATION, SODA PARTNERS, LLC, DMARC 2007-CD5 GARDEN STREET, AND STATE STREET BANK AND TRUST COMPANY,<br><br>                    Defendants. | Adversary No.: 1:17-ap-01040-GM<br><br>**NOTICE OF MOTION AND MOTION OF DAVID K. GOTTLIEB, CHAPTER 11 TRUSTEE, FOR SUMMARY JUDGMENT ON FIRST CLAIM FOR RELIEF (QUIET TITLE) AGAINST DEFENDANTS ELKWOOD ASSOCIATES, LLC AND FIELDBROOK, INC.; DECLARATION OF JEREMY RICHARDS**<br><br>Date:    September 18, 2018<br>Time:   10:00 a.m.<br>Place:   Courtroom 303<br>         United States Bankruptcy Court<br>         21041 Burbank Blvd.<br>         Woodland Hills, CA 91367 |

[1] The Debtors, together with the last four digits of each Debtor's social security number are: Solyman Yashouafar (5875) and Massoud Aaron Yashouafar (6590).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**TO THE HONORABLE GERALDINE MUND, UNITED STATES BANKRUPTCY JUDGE,
AND TO ALL COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that at 10:00 a.m. on September 18, 2018, or as soon thereafter as this matter may be heard before the Honorable Geraldine Mund, United States Bankruptcy Judge, in Courtroom 303 of the above-captioned Court, Plaintiff David K. Gottlieb, as Chapter 11 Trustee ("**Plaintiff**" or the "**Trustee**") for Massoud Yashouafar ("**Massoud**" or the "**Debtor**") and Solyman Yashouafar ("**Solyman**" and together with Massoud, the "**Debtors**") and will and hereby does move the Court for entry of summary judgment in Trustee's favor and against Defendants Elkwood Associates, LLC ("**Elkwood**") and Fieldbrook, Inc. ("**Fieldbrook**" and together with Elkwood, the "**Defendants**") on the First Claim for Relief (Quiet Title) set forth in that certain Third Amended *Complaint to: (I) Quiet Title of the Rexford Home, (II) Avoid Actual and Constructive Fraudulent Transfers of Rexford Home and Actual Fraudulent Transfer of Chalette Home, (III) Recover the Rexford Home and Value of Chalette Home, and (IV) Related Relief* (the "**Complaint**") [Docket No. 80],[1] filed herein on May 12, 2017.[2]

The Trustee commenced the above-captioned adversary proceeding seeking to, among other things, have the Court quiet title with respect to Massoud's home, 910 Rexford Drive, Beverly Hills, CA (the "**Rexford Home**"), which was the subject of a purported non-judicial foreclosure sale by Elkwood after Elkwood already had assigned its entire interest in the promissory note (the "**PWB Note**") that was secured by the deed of trust (the "**Rexford DOT**") against the Rexford Home. When Elkwood assigned its interest in the PWB Note, it lost all rights to enforce the PWB Note and the Rexford DOT. As a result, the foreclosure of the Rexford Home by Elkwood was void. Thus, as of the filing of Massoud's bankruptcy case, he still owned the Rexford Home and the Trustee asks the Court to quiet title to the Rexford Home in the name of Massoud's bankruptcy estate. As discussed herein, the Trustee contends that none of the material facts relevant to this Motion are in

---

[1] Unless otherwise stated, all references herein to "Docket No. ___" are to the docket entries in Adversary No.: 17-ap-01040-GM.

[2] All capitalized terms not defined herein have the meanings ascribed to them in the Complaint.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_SF:96736.4 32274/001

dispute and that he is entitled to judgment, as a matter of law, on all of the First Claim for Relief (Quiet Title) set forth in the Complaint.

This Motion is based upon this Notice, the Memorandum of Points and Authorities attached hereto, the Declaration of Jeremy V. Richards (the "**Richards Declaration**") attached hereto, the Request for Judicial Notice (the "**RJN**") filed herewith, the Statement of Uncontroverted Facts and Conclusions of Law (the "**Statement**") filed herewith, the pleadings and other papers filed in this adversary proceeding and in the chapter 11 case to which it relates, and such further evidence and argument as may be presented at or prior to the hearing on the Motion.

PLEASE TAKE FURTHER NOTICE that pursuant to Local Bankruptcy Rule 7056-1(c), objections and responses, if any, to the Motion shall be filed with the Court and served on Plaintiff's counsel **at least twenty-one (21) days prior to the hearing date**.

Dated:    July 9, 2018

PACHULSKI STANG ZIEHL & JONES LLP

By    */s/ John W. Lucas*
Jeremy V. Richards
John W. Lucas

Counsel to David K. Gottlieb,
Chapter 11 Trustee

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..................................................................................................................1

II. UNCONTROVERTED FACTS ...........................................................................................3

III. STANDARD FOR SUMMARY JUDGMENT...................................................................6

IV. THE TRUSTEE IS ENTITLED TO SUMMARY JUDGMENT.......................................7

    A.    Elkwood Assigned the Entire PWB Note to
            Fieldbrook Prior to the Foreclosure of the Rexford Home ...........................7

    B.    The Foreclosure of the Rexford Home
            Without Right to Enforce PWB Note was Void, not Voidable ..................14

    C.    The PWB Note Could Not Be Split and Assigned in Part
            Without the Express Written Consent of the Borrowers .............................18

    D.    544(a)(3) Provides the Trustee with a Senior Interest in the Rexford Home .............19

    E.    The Trustee's Rights as a Hypothetical *Bona Fide*
            Purchaser of the  Rexford Home Bars Reformation
            as a Matter of California and Bankruptcy Law.............................................21

V. DEFENDANT'S AFFRIMATIVE DEFENSES ARE ALL IRRELEVANT OR INVALID ........24

VI. CONCLUSION.................................................................................................................27

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_SF:96736.4 32274/001

1

# TABLE OF AUTHORITIES

2

Pages

## CASES

3

*Anderson v. Liberty Lobby, Inc.*,
4        477 U.S. 242 (1986) ................................................................................................ 7

*Bank of Am., N.A. v. Gallo* (*In re Gallo*),
5        539 B.R. 88 (Bankr. E.D.N.C. 2015) ................................................................... 23

6    *Barboza v. New Form, Inc.* (*In re Barboza*),
      545 F. 3d 702 (9th Cir. 2008) ............................................................................... 7
7

*Britton v. Co-Op Banking Group*,
8        4 F.3d 742 (9th Cir. 1993) ................................................................................... 11

9    *Caminetti v. Pac. Mutual L. Ins. Co.*,
      22 Cal. 2d 344 (Cal. 1943) .................................................................................. 11
10

*Chavez v. Indymac Mortgage Servs.*,
11       219 Cal. App. 4th 1052 (2013) ............................................................................ 25

12   *City of Los Angeles v. Morgan*,
      105 Cal. App. 2d 726 (Cal. App. Ct. 1951) ........................................................ 20
13

*Consolidated World Investments, Inc. v. Lido Preferred Ltd.*,
14       9 Cal. App. 4th 373 (Cal. Ct. App. 1992) ............................................................. 9

15   *Consumer Cause, Inc. v. Smilecare*,
      91 Cal. App. 4th 454 (2001) ................................................................................ 24
16
      *Crestar Bank v. Neal (In re Kitchin Equip. Co. of Virginia, Inc.)*,
17       960 F.2d 1242 (4th Cir. 1992) ............................................................................. 23

18   *Culhane v. Aurora Loan Services of Nebraska*,
      708 F.3d 282 (1st Cir. 2013) ............................................................................... 17
19
      *Field v. Henshaw (In re Henshaw)*,
20       569 B.R. 800 (Bankr. D. Haw. 2017) .................................................................. 22

21   *Fire Ins. Exchange v. Superior Court*,
      116 Cal. App. 4th 446 (Cal. App. Ct. 2004) ....................................................... 11
22
      *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*,
23       135 Cal. Rptr. 2d 505 (2003) ................................................................................ 8

24   *Gerdlund v. Elec. Dispensers Int'l*,
      235 Cal. Rptr. 279 (Cal. Ct. App. 1987) ............................................................... 9
25
      *Glaski v. Bank of America*,
26       218 Cal. App. 4th 1079 (Cal. App. Ct. 2013) ..................................................... 17

27   *Hacker v. Homeward Residential, Inc.*,
      23 Cal. App. 5th 111 (Cal. App. Ct. 2018) ......................................................... 16

*Haggard v. Kimberly Quality Care, Inc.*,
      39 Cal. App. 4th 508 (Cal. Ct. App. 1995) ......................................................... 10

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*In re Law Developers, LLC*,
404 B.R. 136 (Bankr. E.D.N.C. 2008) ........................................................................... 23

*In re Probasco*,
839 F.2d 1352 (9th Cir. 1988) ....................................................................................... 20

*In re Tleel*,
876 F.2d 769 (9th Cir. 1989) ......................................................................................... 19

*In re Washburn & Roberts, Inc.*,
795 F.2d 870 (9th Cir. 1986) ......................................................................................... 19

*Johnson v. County of Fresno*,
4 Cal. Rptr. 3d 475 (Cal. App. Ct. 2003) ...................................................................... 11

*Masterson v. Sine*,
68 Cal.2d 222 (1968) ....................................................................................................... 8

*Morrow v. Prewitt*, 2005 Cal. App. Unpub. LEXIS 7656 (Cal. App. Ct. Aug. 24, 2005) ................ 20

*North Slope Borough v. Rogstad* (*In re Rogstad*),
126 F.3d 1224 (9th Cir. 1997) ......................................................................................... 7

*Northeastern Bank of Pennsylvania v. Clark (In re White Beauty View, Inc.)*,
81 B.R. 290 (Bankr. M.D. Pa. 1988) ............................................................................. 23

*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.*,
69 Cal.2d 33 (1968) ..................................................................................................... 8, 9

*Peebles v. Commercial Credit Corp. (In re Peebles)*,
197 B.R. 799 (Bankr. W.D. Pa. 1996) ........................................................................... 23

*Rafftery v. Kirkpatrick*,
29 Cal. App. 2d 503 (Cal. App. 1938) ........................................................................... 19

*Rakozy v. Parsons Packing, Inc. (In re Pro-Ag, Inc.)*,
2000 WL 33712201 (Bankr. D. Idaho Sept. 5, 2000) .................................................... 21

*Reilly v. Inquest Tech., Inc.*,
160 Cal. Rptr. 3d 236 (Cal. Ct. App. 2013) ..................................................................... 8

*Schaechter v. Madeoy (In re Madeoy)*,
551 B.R. 172 (D. Md. 2016) .......................................................................................... 22

*Serv. Employees Int'l Union, Local 99 v. Options — A Child Care & Human Servs. Agency*,
133 Cal. Rptr. 3d 73 (Cal. Ct. App. 2011) ....................................................................... 8

*Summers v. Teichert & Son, Inc.*,
127 F.3d 1150 (9th Cir.1997) .......................................................................................... 7

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*,
809 F.2d 626 (9th Cir. 1987) ........................................................................................... 7

*Tahoe National Bank v. Phillips*,
4 Cal. 3d 11 (1971) ......................................................................................................... 8

*Taormina Theosophical Community, Inc. v. Silver*,
140 Cal. App. 3d 964 (Cal. App. Ct. 1983) ................................................................... 20

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

iii

1

*Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC,*
185 Cal. App. 4th 1050 (Cal. App. Ct. 2010) ............................................................... 9

2

*United States ex rel. Kelly v. Boeing Co.,*
9 F.3d 743 (9th Cir. 1993) ........................................................................................... 10

3

4

*United States v. Thornberg,*
82 F.3d 886 (9th Cir. 1996) ......................................................................................... 18

5

*Veal v. American Home Mortgage Servicing, Inc. (In re Veal),*
450 B.R. 897 (B.A.P. 9th Cir. 2011) ........................................................................... 18

6

7

*Wilson v. HSBC Mortgage Services, Inc.,*
744 F.3d 1 (1st Cir. 2014) ............................................................................................ 17

8

*Yvanova v. New Century Mortgage Corp.,*
62 Cal. 4th 919 (Cal. 2016) ......................................................................................... 16

9

## STATUTES

10

11 U.S.C. § 544(a)(3) .............................................................................................. 19, 21

11

11 U.S.C. §548(c) ......................................................................................................... 25

12

Cal. Civ. Code § 1636 ..................................................................................................... 8

13

Cal. Civ. Code § 1639 ..................................................................................................... 8

14

Cal. Civ. Code § 1856 ..................................................................................................... 8

Cal. Civ. Code § 19 ....................................................................................................... 20

15

Cal. Civ. Code § 2936 ................................................................................................... 18

16

Cal. Civ. Code § 3399 ................................................................................................... 21

## RULES

17

Fed. R. Civ. P. 56. ........................................................................................................... 6

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_SF:96736.4 32274/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

The legal theory of the First Claim for Relief (Quiet Title) is simple, namely that, prior to the Rexford Foreclosure Sale, Elkwood, the foreclosing party, assigned the entire PWB Note to Fieldbrook by way of the Fieldbrook Assignment. Defendants do not dispute that Elkwood assigned the entire Chalette DOT to Fieldbrook by way of the Fieldbrook Assignment. As a result, it is unclear how the Fieldbrook Assignment can be interpreted to mean that less than all of the PWB Note was assigned to Fieldbrook when the exact same words, in the exact same sentence, in the exact same document were used to assign the PWB Note. The California Supreme Court requires the same words in the same document to be interpreted and applied with the same meaning. Regardless, there are limitations a court can make when interpreting unambiguous words in a document in that they must be "reasonably susceptible" to the interpretation offered by the Defendants. Here that is not possible because the various interpretations offered by them change the meaning of the words that is unreasonable and contradictory. Thus, Elkwood's actions to foreclose against the Rexford Home were void and without any force or effect because it did not have any right to enforce the PWB Note after it was assigned to Fieldbrook.

Defendants will surely make much of the fact that the Fieldbrook Assignment refers only to the Chalette DOT and not the Rexford DOT. However, that does not help them because if the Rexford DOT was retained by Elkwood for whatever reason the deed alone was useless without Elkwood also having the right to enforce the PWB Note. *Veal v. American Home Mortgage Servicing, Inc. (In re Veal),* 450 B.R. 897, 916 (B.A.P. 9th Cir. 2011). In addition, Defendants do not dispute there is a single promissory note. This is evidenced by the fact that the Fieldbrook Assignment provides Elkwood assigned the Chalette DOT to Fieldbrook "[t]ogether with the Secured Promissory Note or Notes therein described or referred to . . . ." While the Trustee believes the foregoing language was an express assignment of the PWB Note, it does not matter because the transfer of a note or debt obligation automatically carries with it the transfer of any and all related security. Cal. Civ. Code § 2936 ("The assignment of a debt secured by mortgage carries with it the

1

security"); *United States v. Thornberg*, 82 F.3d 886, 892 (9th Cir. 1996). Whether the Rexford DOT was retained by Elkwood or assigned by operation of law, Elkwood did not have any right to enforce the PWB Note rendering its action to foreclose void.

In addition, Defendants fail to affirmatively deny that assigning less than the entire PWB Note would have required the consent of the borrowers (*i.e.*, the Debtors) because it would have changed the Debtors' obligations. The PWB Note provides that "Lender may modify this loan without the consent of or notice to anyone <u>other than the party with whom the modification is made</u>." As reflected therein, Massoud and Solyman executed the PWB Note and are jointly and severally liable. A partial assignment of the PWB Note to Fieldbrook, in whatever amount, would have changed the obligee from one to two. Massoud would lose his rights against Solyman, as a co-obligee (and the Chalette Home), and likewise, Solyman would lose his rights against Massoud and the Rexford Home. Consent to waiver of such rights—an extreme form of "modification"--was never obtained from the Debtors. In addition, there is no documentation reflecting how any payments received from the Debtors would have been applied towards the satisfaction of the PWB Note. For example, how would a $100,000 payment from the Debtors been applied, split evenly between the fictional "Chalette Debt" and "Rexford Debt" or something else?

As a *bona fide* purchaser for value, section 544(a)(3) provides the Trustee with a senior ownership interest in the Rexford Home because at the time the petition was filed the foreclosure was invalid and unenforceable meaning that Massoud still owned the Rexford Home as of the petition date. Defendants will surely argue that the Trustee is not a *bona fide* purchaser for value under section 544(a)(3) because he was on constructive notice of the purported foreclosure after it was recorded on March 5, 2015. However, the recordation of a void sale deed does not provide constructive notice as it was a nullity and does not convert a void act into a valid act.

Lastly, after Defendants failed to obtain stay relief to reform the Fieldbrook Assignment, they filed a motion seeking to amend their answer and counter and cross claims in this adversary proceeding. Defendants' actions to reform the Fieldbrook Assignment must be denied because the equitable remedy of reformation cannot be used to defeat the rights of a trustee in estate property.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

For the reasons stated herein and in argument at the hearing on this Motion, the Trustee respectfully requests the Court to grant summary judgment in favor of the Trustee and quiet title of the Rexford Home in the name of Massoud's bankruptcy estate.

## II.

## UNCONTROVERTED FACTS

The following uncontroverted facts are supported by the Declaration of Jeremy V. Richards (the "**Richards Declaration**"), annexed hereto, the Request for Judicial Notice ("**RJN**"), filed concurrently herewith, and the Statement of Uncontroverted Facts and Conclusions of Law (the "**Statement**"), filed concurrently herewith.

On August 3, 2016 (the "**Petition Date**"), involuntary bankruptcy petitions were filed against Massoud Aaron Yashouafar ("**Massoud**") and Solyman Yashouafar ("**Solyman**" and together with Massoud, the "**Debtors**"). [Massoud Docket No. 1; Solyman Docket No. 1].

The Debtors stipulated to the entry of Orders for Relief in their respective cases, which Orders for Relief were entered on or about September 12, 2016 [Massoud Docket Nos. 92 & 94; Solyman Docket Nos. 94 & 109].

The Debtors stipulated to the appointment of a chapter 11 trustee for each of their bankruptcy estates, and David K. Gottlieb ("**Plaintiff**" or "**Trustee**") was appointed as chapter 11 trustee for both Debtors by orders entered on or about September 20, 2016 [Massoud Docket Nos. 104, 105, 106 & 110; Solyman Docket Nos. 94, 105, 106 & 110].

Prior to the Petition Date, Massoud through his family trust owned 910 Rexford Drive, Beverly Hills, CA (the "**Rexford Home**"). *Answer of Elkwood Associates, LLC and Fieldbrook, Inc. to Third Amended Complaint* [Docket No. 83] (the "**E&F Answer**") at ¶ 17.

Prior to the Petition Date, Solyman through his family trust owned 580 Chalette Drive, Beverly Hills, CA (the "**Chalette Home**"). E&F Answer at ¶ 26.

On March 20, 2009, Massoud and Solyman executed a promissory note (the "**PWB Note**") in favor of Pacific Western Bank ("**PWB**") in the principal amount of $6,551,575.00. E&F Answer at ¶ 32 and Declaration of Jeremy V. Richards (the "**Richards Declaration**") at Exhibit 1.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

3

1    The family trust of Massoud secured the obligations of the PWB Note by, among other

2  things, a deed of trust (the "**Rexford DOT**") against the Rexford Home for the benefit of PWB.

3  Request for Judicial Notice in Support of Summary Judgment Motion (the "**RJN**") at Exhibit A.

4    The family trust of Solyman secured the obligations of the PWB Note by, among other

5  things, a deed of trust (the "**Chalette DOT**") against the Chalette Home for the benefit of PWB. RJN

6  at Exhibit B.

7    On December 29, 2014, Elkwood Associates, LLC ("**Elkwood**") purchased the PWB Note

8  and PWB Loan Documents from PWB, in addition to the ancillary agreements and documents

9  relating to the PWB Note, Rexford DOT, and Chalette DOT (collectively, the "**PWB Loan**

10  **Documents**"). E&F Answer at ¶ 57.

11    After Elkwood purchased the PWB Note and PWB Loan Documents, Elkwood caused

12  Citivest Financial Services, Inc. ("**Citivest**") to be substituted as trustee under the Chalette DOT.

13  E&F Answer at ¶ 59.

14    Citivest, as the trustee under the Chalette DOT, filed and served a Notice of Trustee's Sale

15  (the "**Chalette Foreclosure Sale Notice**") for the benefit of Elkwood. E&F Answer at ¶ 59

16    The Chalette Foreclosure Sale Notice was recorded on or about January 27, 2015. RJN at

17  Exhibit C.

18    On February 18, 2015, Elkwood executed a certain assignment (the "**Fieldbrook**

19  **Assignment**") that assigned the entire Chalette DOT to Fieldbrook. RJN at Exhibit D.

20    The Fieldbrook Assignment is titled as "ASSIGNMENT OF DEED OF TRUST AND

21  PROMISSORY NOTE." RJN at Exhibit D (capitalized font in original).

22    The Fieldbrook Assignment contained the following language:

23

24    For Value Received, the undersigned ELKWOOD ASSOCIATES,
      LLC, A CALIFORNIA LIMITED LIABILITY COMPANY hereby
25    grants, assigns, transfers and conveys to FIELDBROOK, INC., A
      CALIFORNIA CORPORATION all of its right, title and beneficial
26    Interest in and to that certain Deed of Trust dated MARCH 20, 2009
      executed by SOL YMAN YASHOUAFAR, AS TRUSTEE OF THE
27    SOLYMAN AND SOHEILA YASHOUAFAR 2004 TRUST DATED
      MARCH 8, 2004 as Trustor, to PACIFIC WESTERN BANK, as
28    Trustee, for the benefit of PACIFIC WESTERN BANK as beneficiary

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

4

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

and recorded as Instrument No. 20090425658, on March 25, 2009, In Book _____, Page _____ of Official Records in the Office of the County Recorder of Los Angeles County, California, describing land in said county as,

Lot 34 in Tract No. 24484, in the city of Beverly Hills, County of Los Angeles, State of California, as per map recorded in book 657, pages 99 and 100 of maps, in the office of the county recorder of said county.

A.P.N. 4391-009-002 AKA: 580 CHALETTE DRIVE, BEVERLY HILLS, CA 90210

Together with the Secured Promissory Note or Notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust, any liens, security interest, and remedies arising thereunder. This Assignment is made without recourse, representations or warranties of any kind except as may be set forth in any Loan Sale Agreement that may be between assignor and assignee.

Fieldbrook Assignment, RJN at Exhibit **D** (capitalized font in original).

The words that were used to assign the Chalette DOT are the exact same words that were used to assign the PWB Note to Fieldbrook. RJN at Exhibit D.

As reflected by the language used in the Fieldbrook Assignment, the assignment was not limited or qualified nor was there any allocation or participation in the PWB Note in any manner. RJN at Exhibit D.

On February 20, 2015, Citivest conducted a foreclosure sale under the PWB Note and Chalette DOT (the "**Chalette Foreclosure Sale**"). Citivest submitted an opening bid of $5.8 million on behalf of Fieldbrook, the beneficiary under the PWB Note and Chalette DOT.  There being no other bids, the Chalette Home was sold to Fieldbrook at the Chalette Foreclosure Sale for a credit bid of $5.8 million. E&F Answer at ¶¶ 69 and 70.

On February 25, 2015, Citivest executed a *Trustee's Deed Upon Sale* (the "**Chalette Foreclosure Sale Deed**") conveying the Chalette Home to Fieldbrook in exchange for its $5,800,000 credit bid arising under the PWB Note, Chalette DOT, and Fieldbrook Assignment (the "**Chalette Transfer**"). E&F Answer at ¶¶ 69 and 70 and RJN at Exhibit E.

The Chalette Foreclosure Sale Deed was recorded on March 6, 2015. RJN at Exhibit E.

DOCS_SF:96736.4 32274/001

1    After Elkwood purchased the PWB Note and the other PWB Loan Documents, Elkwood

2  caused Citivest to be substituted as the trustee under the Rexford DOT. E&F Answer at ¶ 73.

3    On or about January 26, 2015, Citivest, as the trustee under the Rexford DOT, filed and

4  served a Notice of Trustee's Sale (the "**Rexford Foreclosure Sale Notice**") for the benefit of

5  Elkwood.  E&F Answer at ¶ 74.

6    The foreclosure sale of the Rexford Home was scheduled for February 23, 2015 at 9:30 a.m.

7  (prevailing Pacific Time) at 222 N. Grand Ave, Los Angeles, CA 90012. E&F Answer at ¶ 75.

8    On February 23, 2015, Citivest conducted a purported foreclosure sale of the Rexford Home

9  (the "**Rexford Foreclosure Sale**").  Citivest, on behalf of Elkwood, opened the bidding with a credit

10  bid of $782,508.05.  There being no other parties appearing at the Rexford Foreclosure Sale, the

11  Rexford Home was sold to Elkwood in exchange for a credit bid of $782,508.05. E&F Answer at

12  ¶ 77 RJN and Exhibit F.

13    On or about February 25, 2015, Citivest, on behalf of Elkwood, executed a *Trustee's Deed*

14  *Upon Sale* (the "**Rexford Foreclosure Sale Deed**") conveying the Rexford Home to Elkwood

15  Elkwood. The Rexford Foreclosure Sale Deed reflects that Elkwood, not Fieldbrook, was the

16  foreclosing party/beneficiary and that Elkwood took ownership of the Rexford Home by way of

17  foreclosure in exchange for a purported credit bid of $782,508.05 under the PWB Note. E&F

18  Answer at  78 and RJN at Exhibit G.

19    The Rexford Foreclosure Sale Deed was recorded on March 6, 2015. RJN at Exhibit G.

### III.

### STANDARD FOR SUMMARY JUDGMENT

22    Rule 56 of the Federal Rules of Civil Procedure applies in this adversary proceeding.  *See*

23  Fed. R. Bankr. P. 7056.  Under Rule 56, "[t]he court shall grant summary judgment if the movant

24  shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

25  as a matter of law." Fed. R. Civ. P. 56.  Summary judgment is available under Bankruptcy Rule

26  7056 when "the pleadings, depositions, answers to interrogatories, and admissions on file, together

27  with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

6

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   moving party is entitled to a judgment as a matter of law." *North Slope Borough v. Rogstad* (*In re*

2   *Rogstad*), 126 F.3d 1224, 1227 (9th Cir. 1997).

3       "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary

4   judgment." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.

5   1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Rather, following the

6   filing of "a properly submitted summary judgment motion, the burden shifts to the opposing party to

7   set forth specific facts showing that there is a genuine issue for trial." *Barboza v. New Form, Inc.* (*In*

8   *re Barboza*), 545 F. 3d 702, 707 (9th Cir. 2008).  The opposing party cannot simply assert the "mere

9   existence of some alleged factual dispute between the parties" (*Liberty Lobby*, 477 U.S. at 247-48),

10  nor can it "rest upon the mere allegations or denials" in the pleadings. *Id.*  "For an issue to be

11  'genuine,' there must be evidence such that a reasonable jury could reach a verdict in favor of the

12  nonmoving party." *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir.1997) (citing

13  *Liberty Lobby*, 477 U.S. at 250)).

14                                  **IV.**

15              **THE TRUSTEE IS ENTITLED TO SUMMARY JUDGMENT**

16  **A.      Elkwood Assigned the Entire PWB Note to
            Fieldbrook Prior to the Foreclosure of the Rexford Home**

17

18       The Defendants do not dispute that the language used by Elkwood to effectuate the transfer

19  of the Chalette DOT to Fieldbrook contains no limitations or conditions (*i.e.*, the entire Chalette

20  DOT was assigned). Statement at ¶ 13.  The operative words used to assign the Chalette DOT are the

21  same words that were used to transfer the PWB Note. Statement at ¶¶ 15 and 16.  The same words

22  in the Fieldbrook Assignment should not be interpreted with one meaning as they relate to the

23  assignment of the Chalette DOT and a different meaning when they relate to the assignment of the

24  PWB Note.  Further, as demonstrated below, the operative words in the Fieldbrook Assignment are

25  not patently ambiguous nor are they "reasonably susceptible" to any interpretation that Elkwood

26  assigned only a portion of the PWB Note or assigned a "participation interest" in the PWB Note.

27  For purposes of the Motion, the express written assignment or transfer of the Rexford DOT is

28  irrelevant.  The dispositive issue is whether the PWB Note was assigned.  Even if it is assumed that

                                    7

Elkwood retained its interest in the Rexford DOT, Elkwood was left with nothing to enforce because the Rexford DOT was rendered void upon its separation from the PWB Note (or, at a minimum the Rexford DOT also was assigned to Fieldbrook as a matter of law because the security follows the note).

Under California law, which applies in this adversary proceeding, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636; *see also Reilly v. Inquest Tech., Inc.*, 160 Cal. Rptr. 3d 236, 249 (Cal. Ct. App. 2013).  However, it is not the parties' subjective intent that matters, but rather their "objective intent, as evidenced by the words of the contract." *Reilly*, 160 Cal. Rptr. 3d at 249 (quoting *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 135 Cal. Rptr. 2d 505 (2003)).  If a contract is reduced to writing, "the intention of the parties is to be ascertained from the writing alone," Cal. Civ. Code § 1639, the words being interpreted in their "ordinary and popular sense," *id* § 1644, provided that the language "is clear and explicit, and does not involve an absurdity," *id.* § 1638.  Finally, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Id.* § 1641; *see also Serv. Employees Int'l Union, Local 99 v. Options — A Child Care & Human Servs. Agency*, 133 Cal. Rptr. 3d 73, 79-80 (Cal. Ct. App. 2011).

The parol evidence rule generally prohibits the introduction of extrinsic evidence to vary or contradict the terms of an integrated written instrument. Cal. Civ. Code § 1856.  The parol evidence rule is based upon the premise that the written instrument is the agreement of the parties. *Tahoe National Bank v. Phillips*, 4 Cal. 3d 11, 22-23 (1971).  Under California law, the application of the parol evidence rule involves a two part analysis:  (1) was the writing intended to be an integration, *i.e.*, a complete and final expression of the parties' agreement, precluding any evidence of collateral agreements, *Masterson v. Sine*, 68 Cal.2d 222 (1968); and (2) is the agreement susceptible of the meaning contended for by the party offering the evidence? *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.*, 69 Cal.2d 33, 40 (1968).  Or to put another way, the court in *PG&E* held that the test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

8

whether the instrument appears to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. *Id.* at 37.

However, even when the application of parol evidence is permitted, it cannot be used "to flatly contradict the express terms of the agreement.  Thus if the contract calls for the plaintiff to deliver to defendant 100 pencils by July 21, 1992, parol evidence is not admissible to show that when the parties said 'pencils' they really meant 'car batteries' or that when they said 'July 21, 1992' they really meant May 13, 2001." *Consolidated World Investments, Inc. v. Lido Preferred Ltd.*, 9 Cal. App. 4th 373, 379 (Cal. Ct. App. 1992).

In *Consolidated World*, the plaintiff argued that the provision "[t]he anticipated period of escrow shall be 60 days from the date of this Agreement" meant the 60 day closing period began to run after the plaintiff obtained a loan commitment. *Id.*  The court refused to admit parol evidence or interpret the provision in the foregoing manner because "[t]o assert the phrase 'from the date of this Agreement' really means 'from the date CWI obtains a loan commitment on the property' is to flatly contradict the terms of the agreement. *Id.*; *see also Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC*, 185 Cal. App. 4th 1050 (Cal. App. Ct. 2010) (refusing to interpret "[t]enant and Landlord shall each have the right to terminate . . ." to mean that only one party had the right to terminate because parol evidence "cannot be used to flatly contradict the express terms of the agreement.").

Only when language is "reasonably susceptible" to the proposed interpretation, may extrinsic evidence be used or considered to explain or otherwise shed light upon the parties' intent. *Gerdlund v. Elec. Dispensers Int'l*, 235 Cal. Rptr. 279, 284 (Cal. Ct. App. 1987).  In *Gerdlund*, plaintiffs sued for wrongful termination arguing that the provision "[n]otice of termination may be given at any time and for any reason" should be interpreted to mean "for any good reason." *Id.*  The court disagreed because the meaning of "any reason" was not reasonably susceptible to an interpretation of "for any good reason" under the circumstances. *Id.*  While both parties submitted testimony regarding their intentions, the court excluded the parol evidence because the

> [t]estimony of intention which is contrary to a contract's express
> terms, however, does not give meaning to the contract:  rather it seeks

DOCS_SF:96736.4 32274/001

1    to substitute a different meaning. It follows under the *P.G. & E.* case
2    that such evidence must be excluded.

3    *Gerdlund* at 284.

4    Similarly, in *Haggard v. Kimberly Quality Care, Inc.*, 39 Cal. App. 4th 508, 520 (Cal. Ct.

5    App. 1995), the court held that the "written at-will provision here, however, is not 'reasonably

6    susceptible' to an interpretation that plaintiff's employment could be terminated only for good cause.

7    The Agreement states in no uncertain terms that employment is terminable by either party 'at will, at

8    any time, with or without cause or advance notice.' The construction commanded by the language is

9    inescapable."

10    Here, Elkwood does not dispute that it assigned the entire Chalette DOT by way of the

11    following language in the Fieldbrook Assignment:

12    > For Value Received, the undersigned ELKWOOD ASSOCIATES,
     > LLC, A CALIFORNIA LIMITED LIABILITY COMPANY hereby
13    > **grants, assigns, transfers and conveys to FIELDBROOK, INC.**, A
     > CALIFORNIA CORPORATION **all of its right, title and beneficial**
14    > **interest in and to that** certain Deed of Trust dated MARCH 20, 2009
     > executed by SOLYMAN YASHOUAFAR, AS TRUSTEE OF THE
15    > SOLYMAN AND SOHEILA YASHOUAFAR 2004 TRUST DATED
     > MARCH 8, 2004 as Trustor, to PACIFIC WESTERN BANK, as
16    > Trustee, for the benefit of PACIFIC WESTERN BANK as beneficiary
     > and recorded as Instrument No. 20090425658, on March 25, 2009, in
17    > Book _____, Page _____ of Official Records in the Office
     > of the County Recorder of Los Angeles County, California, describing
18    > land in said county as . . .
19

20    Fieldbrook Assignment, pg. 1, para. 1 (Underscored and boldfaced type added but capital typeface in

21    the original). Statement at ¶ 13.

22    The words "grants, assigns, transfers and conveys" were used by Elkwood to transfer the

23    **entire** interest in the Chalette DOT to Fieldbrook. Statement at ¶ 15.  It is well established that a

24    valid assignment does not require terms of art. *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743,

25    748 (9th Cir. 1993).  The assignor is not even required to use the word "assign." Allan E.

26    Farnsworth, Contracts § 11.3, at 786 (2d ed. 1990).  While the single word "assign" would have been

27    sufficient, Defendants nonetheless used multiple words (*i.e.*, "grants, assigns, transfers and

28    conveys") to ensure that the entire Chalette DOT was transferred from Elkwood to Fieldbrook.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

10

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   Under general contract principles, an effective assignment is evidenced by a manifestation of

2   the assignor's intent to transfer the right. *Britton v. Co-Op Banking Group*, 4 F.3d 742, 746 (9th Cir.

3   1993); *see generally* Restatement (Second) of Contracts, § 317(l) (1981) ("an assignment of a right

4   is a manifestation of the assignor's intention to transfer it"); *id.* at § 324 ("it is essential to an

5   assignment of a right that the [assignor] manifest an intention to transfer the right to another

6   person"). A provision specifying a party's manifestation is evidence of such intent. *Britton*, 4 F.3d

7   at 746. When complete, an assignment carries with it all of the rights of the assignor and "once the

8   transfer has been made, the assignor lacks standing to sue on the claim." *Johnson v. County of*

9   *Fresno*, 4 Cal. Rptr. 3d 475, 482 (Cal. App. Ct. 2003).

10   Here, when Elkwood granted, assigned, transferred, and conveyed its interest in the Chalette

11   DOT, there were no limitations or conditions. Statement at ¶ 15. The words used in the Fieldbrook

12   Assignment (*i.e.*, "all of its right, title and beneficial interest in and to that") show that Elkwood

13   intended to convey or transfer everything it owned relating to the Chalette DOT. And, Fieldbrook

14   acted consistently with that—it, and not Elkwood, foreclosed under the Chalette DOT, credit bid at

15   the Chalette foreclosure, took ownership of the Chalette Home, and subsequently sold the Chalette

16   Home. Statement at ¶¶ 18-25.

17   The California Supreme Court has long followed the "same meaning rule" in the construction

18   of contracts and instruments. "Words used in a certain sense in one part of an instrument are

19   deemed to have been used in the same sense in another." *Caminetti v. Pac. Mutual L. Ins. Co.*, 22

20   Cal. 2d 344, 358 (Cal. 1943) (internal citations omitted). Similarly, while most words, when

21   considered in isolation, may have more than one definition or usage, in construing a contract the

22   court's function is not merely to import all of the possible definitions or even the broadest definition,

23   but to glean the meaning of the words from the context and usage of the words in the contract itself.

24   *Fire Ins. Exchange v. Superior Court*, 116 Cal. App. 4th 446, 454 (Cal. App. Ct. 2004).

25   In the Fieldbrook Assignment, Elkwood used the same words, "grants, assigns, transfers and

26   conveys" and "all of its right, title and beneficial interest in and to that," to assign the PWB Note,

27   which was identified in the Fieldbrook Assignment by the following:

28

> **Together with the Secured Promissory Note or Notes therein described or referred to, the money due and to become due thereon with interest**, and all rights accrued or to accrue under said Deed of Trust, any liens, security interest, and remedies arising thereunder.

Fieldbrook Assignment, pg. 1, para. 4 (underscored and boldfaced type added); Statement at ¶ 15.

The words "Together with" demonstrate that when Elkwood "grants, assigns, transfers and conveys" "all rights, title and beneficial interest" in the Chalette DOT it was being done "**together with**" the "Secured Promissory Note or Notes" (*i.e.*, the PWB Note).  The language in the Fieldbrook Assignment not only references the PWB Note but also all the "money due and to become due" under the PWB Note. Notably, the Fieldbrook Assignment does not qualify the assignment of the PWB Note in any manner. Statement at ¶ 15.  Instead, the Fieldbrook Assignment assigns the entire sum the Debtors are obligated to pay, not a portion, percentage, or a fraction but the "money due and to become due," which was in excess of $6,500,000. Statement at ¶ 15.

The Fieldbrook Assignment is the only operative document that effectuated the assignment of Elkwood's rights to Fieldbrook.  There is not any other agreement or transactional document between Elkwood and Fieldbrook that reflects anything to the contrary.  Notably, after the assignment, Fieldbrook recorded the Fieldbrook Assignment to inform the world that it was the holder of the Chalette DOT and the underlying PWB Note.  The words used in the Fieldbrook Assignment are not ambiguous nor are they reasonably susceptible to an interpretation other than the entire PWB Note was assigned.  In accordance with the reasoning of the courts in the above-cited decisions, the "construction commanded by the language is inescapable."

Nevertheless, Defendants will undoubtedly argue that the memo from Ms. Guerrero, dated February 17, 2015 (the "**Guerrero Memo**"), shows that Elkwood subjectively intended to assign less than the entire PWB Note. The Guerrero Memo is not the transactional document that was used to effectuate the assignment from Elkwood to Fieldbrook.  The Guerrero Memo is not even a document between Elkwood and Fieldbrook.  Instead, the Guerrero Memo is simply a letter from Fieldbrook to Citivest directing how the foreclosure auction should be conducted.  The Guerrero Memo does not memorialize additional terms or qualify the effectiveness of the Fieldbrook Assignment. Importantly, the Guerrero Memo pre-dates the Fieldbrook Assignment and refers to an

12

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

assignment that had not yet occurred.  To the extent there is any relationship between the Fieldbrook Assignment and the Guerrero Memo, the Fieldbrook Assignment superseded the Guerrero Memo and the Guerrero Memo does not have any force or effect with respect to the actual assignment between Elkwood and Fieldbrook.

The Guerrero Memo has other issues that render it insufficient to justify rewriting the future transactional document—the Fieldbrook Assignment.  For example, Ms. Guerrero states more than one time that a "portion of the debt" is secured by the Chalette Home or the Rexford Home.  However, that is not correct.  There is no "portion of the debt" because the entire PWB Note was secured by the Chalette DOT and the Rexford DOT, which is why Pacific Western Bank was unwilling to bifurcate the PWB Note and allocate debt among the two separate deeds of trust, as Defendants' predecessor/affiliate, Kensington Associates, LLC, repeatedly requested.  If the Guerrero Memo was intended to have any effect on the substantive elements of the Fieldbrook Assignment, Defendants presumably would have recorded this document just as they recorded the Fieldbrook Assignment.

Lastly on this issue, Defendants filed *Motion for Relief from Automatic Stay* [Docket No. 594] (the "**Relief From Stay Motion**") seeking relief from the automatic stay so that they could reform the Fieldbrook Assignment (the so-called "**Corrective Fieldbrook Assignment**") as follows:

> Together with **an interest in the amount of $5,800,000.00** in that certain Promissory Note dated March 20, 2009, in the original principal amount of $6,551,575.00 from Massoud Yashouafar and Solyman Yashouafar as "Borrowers" to Pacific Western Bank (the "Note"), including all rights to collect up to the amount of $5,800,000.00 from the Borrowers under that Note, the above referenced Deed of Trust and any related loan documents.

Relief from Stay Motion at Ex. F (emphasis added) RJN at Exhibit I.

The proposed Corrective Fieldbrook Assignment demonstrates two things.  First, in their two prior motions to dismiss, Defendants never argued Elkwood retained the PWB Note and sold an interest in the PWB Note to Fieldbrook (*i.e.*, a participation).  Instead, they argued that "the entire PWB Note was not assigned by Elkwood to Fieldbrook under the Fieldbrook Assignment." [Docket No. 16 at 17:19-20]; *see also* [Docket No. 49 at 5-14] (Defendants argue multiple times that

13

Elkwood assigned only a portion or less than all of the PWB Note). Defendants presumably are changing their story about what was assigned because they know it was not possible to assign less than all of the PWB Note without the express written consent of the Debtors, which was never obtained.

Second, the Defendants' attempt to reform the Fieldbrook Assignment into a "participation" instead of a partial assignment is not credible because any participation in the PWB Note would have required a participation agreement between Elkwood and Fieldbrook. The Fieldbrook Assignment or the Corrective Fieldbrook Assignment certainly cannot serve as such participation agreement. The Trustee previously propounded discovery upon the Defendants and they never produced any participation agreement. Both the Fieldbrook Assignment and Corrective Fieldbrook Assignment is just that, an assignment, not a participation agreement that outlines the rights, benefits, and obligations of the respective parties to the participation.

In the end, the Guerrero Memo and the Corrective Fieldbrook Assignment, per the case law cited above, cannot be used to contradict the plain and unambiguous meaning of the Fieldbrook Assignment. Like *Consolidated World* cited above, Defendants cannot interpret the words all "the money due and to become due therein with interest" to mean something less than everything or a simple interest in the PWB Note as those meanings would contradict the plain meaning of the words used in the Fieldbrook Assignment, thus demonstrating that the Fieldbrook Assignment is not "reasonably susceptible" to any of Defendants' evolving interpretations.

**B.     The Foreclosure of the Rexford Home
        <u>Without Right to Enforce PWB Note was Void, not Voidable</u>**

Effective upon the assignment of a debt, the assignor loses all rights to enforce the debt and any action taken by the assignor is void. *Sciarratta v. U.S. Bank Nat'l Assoc.*, 202 Cal. Rptr. 3d 219, 228 and 229 (Cal. App. Ct. 2016). In *Sciarratta*, the court held that

> a homeowner who has been foreclosed on by one with no right to do
> so—by those facts alone—sustains prejudice or harm sufficient to
> constitute a cause of action for wrongful foreclosure. When a non-
> debtholder forecloses, a homeowner is harmed by losing her home to
> an entity with no legal right to take it. Therefore, under those
> circumstances, the void assignment is the proximate cause of actual

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_SF:96736.4 32274/001

injury and all that is required to be alleged to satisfy the element of prejudice or harm in a wrongful foreclosure cause of action.

The opposite rule, urged by defendants in this case, would allow an entity to foreclose with impunity on homes that were worth less than the amount of the debt, even if there were no legal justification whatsoever for the foreclosure. The potential consequences of wrongfully evicting homeowners are too severe to allow such a result.

*Id.* at 221-222.

The facts in *Sciarratta* are substantially similar to the facts before the Court as they relate to the effect of assigning a debt obligation by a party that subsequently seeks to foreclose using the debt that was assigned.  In *Sciarratta*, the borrower executed a promissory note in June 2005 secured by a deed of trust against her home. *Id.* On April 27, 2009, Chase, the original owner of the note and deed of trust, assigned the debt and collateral to Deutsche Bank. *Id.* at 223.  At that time, the borrower was in default and a notice of a trustee's sale was recorded in July 2009.  In November 2009, Chase, the original owner of the note and deed of trust, attempted to assign the same note and deed of trust to Bank of America. *Id.* at 223.  After purportedly taking assignment and ownership of the debt and deed of trust, Bank of America foreclosed against the borrower's home in exchange for a credit bid. *Id.*  In December 2009, Chase attempted to correct the April 27, 2009 assignment to Deutsche Bank by executing and filing a corrected assignment that reflected the assignment was really to Bank of America. *Id.*

In light of the above uncontroverted facts, the court held that

Given these unequivocal assertions and Sciarratta's failure to develop the inconsistent alternative theory in her brief, we do not address whether the first amended complaints states a viable cause of action on an alternative theory that the "wrong" trustee initiated foreclosure. (*See Sehulster Tunnels/Pre-Con v. Traylor Brothers, Inc./Obayashi Corp.* (2003) 111 Cal.App.4th 1328, 1345, fn. 16 [4 Cal. Rptr. 3d 655] [declining to address an alternative theory not developed in the party's appellate brief].) previously (in Apr. 2009) assigned the promissory notes and deed of trust to Deutsche Bank. The documents properly subject to judicial notice are consistent with these allegations. On April 27, 2009, Chase executed a document entitled "Assignment of Deed of Trust" where it "hereby grants assigns and transfers to Deutsche Bank … all beneficial interest under that certain Deed of Trust … executed by Monica Sciarratta … [¶] [t]ogether with the note or notes therein described … ." Approximately six months later, on

15

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Case 1:17-ap-01040-MT    Doc 98    Filed 07/09/18    Entered 07/09/18 14:42:45    Desc
Main Document    Page 23 of 50

November 3, 2009, Chase purported to assign the same trust deed and promissory notes to Bank of America.

Chase, having assigned "all beneficial interest" in Sciarratta's notes and deed of trust to Deutsche Bank in April 2009, could not assign again the same interests to Bank of America in November 2009. (*See California Bank & Trust v. Piedmont Operating Partnership* (2013) 218 Cal.App.4th 1322, 1347 [161 Cal. Rptr. 3d 167] a claim has been assigned, unless a contrary intention is shown, the assignment ""vests in the assignee the assigned contract or chose and all rights and remedies incidental thereto""].)

Thus, assuming Sciarratta's allegations are true, as we must on review of the demurrer, the assignment to Bank of America is void, and not merely voidable.

*Id.* at 228 (citing the California Supreme Court decision *Yvanova v. New Century Mortgage Corp.*, 62 Cal. 4th 919, 935 (Cal. 2016) for the proposition that foreclosure without the right to foreclose is void, not voidable); *Hacker v. Homeward Residential, Inc.*, 23 Cal. App. 5th 111, 121 (Cal. App. Ct. 2018) (citing to *Sciarratta* and finding that where a party forecloses against property without having the legal right to take such action renders the foreclosure void.

The document (the "**<u>Sciarratta Assignment</u>**") that Chase used to assign the note and deed of trust in *Sciarratta* is substantially similar if not identical to the Fieldbrook Assignment. RJN at Exhibit H.  The Sciarratta Assignment provides that Chase "grants, assigns and transfers to Deutsche Bank" the relevant deed of trust "TOGETHER with the notes or notes therein described and secured thereby, the money due and to become due thereon, with interest . . . ." Sciarratta Assignment, p. 1; *Sciarratta*, 202 Cal. Rptr. 3d at 228 (capitalization in original); RJN at Exhibit H.

In the Sciarratta Assignment, Chase used the same or substantially same words to assign the note and deed of trust to Deutsche Bank that were used by Elkwood.  In *Sciarratta*, the court held that the assignment resulted in a complete assignment and relinquishment of the note and deed of trust.  Thus, when Chase subsequently attempted to assign the same documents to Bank of America, and its correction of the same, the court held that Chase had nothing to assign as Deutsche Bank was the valid holder of the deed of trust <u>and the debt instrument</u>.  Importantly, Bank of America's foreclosure was void because it was never assigned anything on which to base a foreclosure.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

16

DOCS_SF:96736.4 32274/001

Here, the facts are substantially the same. It is undisputed that on February 18, 2015, Elkwood assigned to Fieldbrook the Chalette DOT.  Like the Sciarratta Assignment, the Fieldbrook Assignment provided that the Chalette DOT was assigned "Together with the Secured Promissory Note or Notes therein described or referred to, the money due and to become due thereon with interest . . . ."  Defendants do not dispute that the meaning of the words in the Fieldbrook Assignment mean and were intended to convey the entire Chalatte DOT.  Consequently, it is unclear how Defendants contend at the same time that only a portion of the PWB Note was assigned using the very same language.  The Fieldbrook Assignment was clear on its face and there are no other agreements or transactional documents between Elkwood and Fieldbrook that show anything other than a complete assignment of the PWB Note.  Also, and as discussed in the section above, the language used in the Fieldbrook Assignment is not reasonably susceptible to any other interpretation because it would contradict the plain meaning of the words used by Elkwood.  As a result of Elkwood's assignment of the PWB Note to Fieldbrook, Elkwood was in the exact same position as Bank of America when Elkwood attempted to foreclose against the Rexford Home.  Elkwood became a stranger to the PWB Note immediately upon the assignment of the PWB Note just as Bank of America was a stranger to the debt when it received nothing from Chase, which had already assigned the debt to Deutsche Bank.  Neither party held any interest in the underlying note.  As a consequence, the foreclosure was void on its face, not voidable.

In addition to *Sciarratta*, the other case law supports the Trustee's position that Elkwood's foreclosure was void, not voidable. *See, e.g., Glaski v. Bank of America*, 218 Cal. App. 4th 1079, 1096 and 1097 (Cal. App. Ct. 2013) (assignment void, not voidable, where entity invoking the power of sale was not the holder of the deed of trust); *Culhane v. Aurora Loan Services of Nebraska*, 708 F.3d 282, 291 (1st Cir. 2013) (mortgage assignment is void, not merely voidable, where the assignor "had nothing to assign" or "no interest to assign"); *Wilson v. HSBC Mortgage Services, Inc.*, 744 F.3d 1, 9-14 (1st Cir. 2014) (discussing the effect of a foreclosure by way of a void transaction).[1]

---

[1]  In *Yvanova*, the California Supreme Court cited *Culhane* and *Wilson* with approval. *Yvanova*, 62 Cal.4th at 935 and 940.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Lastly, while the Trustee believes as a matter of law that the Rexford DOT automatically followed the PWB Note, the dispositive issue is whether the entire PWB Note was assigned. As discussed herein, because the PWB Note was assigned in its entirety, Elkwood was left with nothing to enforce even if it is assumed Elkwood retained the Rexford DOT. Restatement (Third) of Property (Mortgages) § 5.4 cmt. e. (1997) ("In general a mortgage is unenforceable if it is held by one who has no right to enforce the secured obligation."). It is well established under California law that the transfer of a note or debt obligation automatically carries with it the transfer of any and all related security. Cal. Civ. Code § 2936 ("The assignment of a debt secured by mortgage carries with it the security"); *United States v. Thornberg*, 82 F.3d 886, 892 (9th Cir. 1996) ("Under the law of California . . ., the Bank's assignment of the underlying debt carried with it the Mortgage securing the debt. [Citation omitted]." Because the PWB Note was assigned, the Rexford DOT was assigned by operation of law even if the Rexford DOT was not expressly referenced in the Fieldbrook Assignment. If for some unknown reason the Rexford DOT was retained by Elkwood, then the Rexford DOT would have been unenforceable in the hands of Elkwood because Elkwood no longer held the PWB Note. *Veal v. American Home Mortgage Servicing, Inc. (In re Veal),* 450 B.R. 897, 916 (B.A.P. 9th Cir. 2011) (". . . under the common law generally, the transfer of a mortgage without the transfer of the obligation it secures renders the mortgage ineffective and unenforceable in the hands of the transferee. Restatement (Third) of Property (Mortgages) § 5.4 cmt. e. (1997) ('In general a mortgage is unenforceable if it is held by one who has no right to enforce the secured obligation. [Footnote omitted]')."

## C.    The PWB Note Could Not Be Split and Assigned in Part Without the Express Written Consent of the Borrowers

Defendants fail to affirmatively deny that assigning less than the entire PWB Note would have required the consent of the borrowers (*i.e.*, the Debtors) because it would have changed the Debtors' obligations. The PWB Note provides that "Lender may modify this loan without the consent of or notice to anyone <u>other than the party with whom the modification is made</u>." PWB Note, p. 3 (emphasis added); Richards Declaration at Exhibit 1. As reflected therein, Massoud and Solyman executed the PWB Note and are jointly and severally liable. A partial assignment of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_SF:96736.4 32274/001

PWB Note to Fieldbrook, in whatever amount, would have changed the obligee from one to two.

Massoud would lose his rights against Solyman, as a co-obligee (and the Chalette Home), and

likewise, Solyman would lose his rights against Massoud and the Rexford Home.  Consent to waiver

of such rights—an extreme form of "modification"--was never obtained from the Debtors.  In

addition, there is no documentation reflecting how any payments received from the Debtors would

have been applied towards the satisfaction of the PWB Note.  For example, how would a $100,000

payment from the Debtors been applied, split evenly between the fictional "Chalette Debt" and

"Rexford Debt" or something else?

In the end, an assignment of less than the entire PWB Note would have modified the

Debtors' obligations and required their express consent, which was never obtained and cannot be

reformed in any manner because as of the Petition Date the Trustee assumed control of this right,

which may not be changed, supplemented, or altered in any manner.  Thus, even if the Fieldbrook

Assignment was reasonably susceptible to an interpretation that less than the entire amount was

assigned, such assignment would still be void because it was not accompanied by the Debtors'

agreement to modify the terms of the PWB Note.

**D.**    **544(a)(3) Provides the Trustee with a Senior Interest in the Rexford Home**

A bankruptcy trustee holds "strong arm powers" provided by section 544(a)(3) of the

Bankruptcy Code, which states the trustee is to be considered:

> A bona fide purchaser of all real property . . . from the debtor, against
> whom applicable law permits such transfer to be perfected, that attains
> the status of a bona fide purchaser and has perfected such transfer at
> the time of the commencement of the case, whether or not such a
> purchaser exists.

11 U.S.C. § 544(a)(3).

A bankruptcy court looks to state law to determine the rights of a *bone fide* purchaser for

value. *In re Washburn & Roberts, Inc.*, 795 F.2d 870, 872 (9th Cir. 1986).  Under California law, a

*bona fide* purchaser without actual or constructive notice takes free of a prior equitable interest or

constructive trust interest. *Raffery v. Kirkpatrick*, 29 Cal. App. 2d 503, 507-508 (Cal. App. 1938); *In

re Tleel*, 876 F.2d 769, 771-72 (9th Cir. 1989). Section 544(a)(3) makes a trustee's actual knowledge

irrelevant. *Tleel*, 876 F.2d at 772.  Constructive notice will preclude avoidance under section

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

19

544(a)(3). *In re Probasco*, 839 F.2d 1352, 1354-55 (9th Cir. 1988).  A party has constructive or inquiry notice of another's interest in property when he or she has knowledge of circumstances or a condition of the property that would prompt a prudent person to inquire about the other's interest and the prosecution of the inquiry would have revealed the other's interest. *See* Cal. Civ. Code § 19 (West 1982); 3 Harry D. Miller & Marvin B. Starr, *California Real Estate* §§ 8:62, 8:63, 8:65 (2d ed. 1989).  A purchaser of real estate is charged with notice of any document in the real estate recording system and any fact which such document would lead a reasonably prudent person to inquire about and discover but **not** if the filed document is void. *Taormina Theosophical Community, Inc. v. Silver*, 140 Cal. App. 3d 964, 971 (Cal. App. Ct. 1983) (holding that "[r] ecording itself grants no interest in the property (ibid.), and a void document 'derives no validity from the mere fact that it is recorded.'"); (*Morrow v. Prewitt*, 2005 Cal. App. Unpub. LEXIS 7656, *44 (Cal. App. Ct. Aug. 24, 2005) (holding that parties "cannot be presumed to have had constructive notice of the Prewitt Deed of Trust because that document is void and invalid, and thus it is to be treated like a blank sheet of paper."); *City of Los Angeles v. Morgan*, 105 Cal. App. 2d 726, 733 (Cal. App. Ct. 1951) (holding that "[a]n instrument that is void ab initio is comparable to a blank piece of paper and so necessarily derives no validity from the mere fact that it is recorded. As a consequence the record thereof is not constructive notice of its contents or of the fact that it is actually recorded.") (internal citations omitted).

A hypothetical buyer, who looked at the real estate records of the Rexford Home on the date of the Debtors' bankruptcy petition, would have seen that Elkwood recorded its sale deed relating to the Rexford Home on or about March 5, 2015 but the recordation of the sale deed was void and could not provide any constructive notice of Elkwood's purported ownership of the Rexford Home.

As a *bona fide* purchaser for value, section 544(a)(3) provides the Trustee with a senior ownership interest in the Rexford Home because at the time the petition was filed the foreclosure was invalid and unenforceable meaning that Massoud still owned the Rexford Home as of the petition date, which automatically became property of his bankruptcy estate.

**E.**   **The Trustee's Rights as a Hypothetical *Bona Fide* Purchaser of the**
**Rexford Home Bars Reformation as a Matter of California and Bankruptcy Law**

Considering that the Relief from Stay Motion was denied, the Trustee anticipates that

Defendants will again raise the defense of reformation, which for the reasons stated herein is not

available. California law permits reformation of a contract only under the following circumstances:

> When, through fraud or a mutual mistake of the parties, or a mistake of
> one party, which the other at the time knew or suspected, a written
> contract does not truly express the intention of the parties, it may be
> revised on the application of a party aggrieved, so as to express that
> intention, **so far as it can be done without prejudice to rights**
> **acquired by third persons, in good faith and for value**.

Cal. Civ. Code § 3399 (emphasis added).  As discussed above, the Trustee holds "strong arm

powers" pursuant to section 544(a)(3) of the Bankruptcy Code, which states that he is to be

considered:

> A bona fide purchaser of all real property . . . from the debtor, against
> whom applicable law permits such transfer to be perfected, that attains
> the status of a bona fide purchaser and has perfected such transfer at
> the time of the commencement of the case, whether or not such a
> purchaser exists.

11 U.S.C. § 544(a)(3).  Thus, pursuant to the express language of California Civil Code §3399,

reformation cannot be obtained against the Trustee, in his capacity as a hypothetical *bona fide*

purchaser of the Rexford Property as of the Petition Date.

Numerous bankruptcy cases have held that the equitable remedy of reformation cannot be

used to defeat the rights of a trustee in estate property.  In *Rakozy v. Parsons Packing, Inc. (In re*

*Pro-Ag, Inc.)*, 2000 WL 33712201 (Bankr. D. Idaho Sept. 5, 2000), a bankruptcy trustee brought an

adversary proceeding seeking a determination that an agreement between the debtor and Parsons was

a sale agreement as opposed to a true lease. *Id*. at *1.  The bankruptcy court analyzed the contract

and determined that by its terms, the agreement was a sale agreement.  This had the effect of

bringing the proceeds of the sale into the bankruptcy estate; if the agreement were a lease, then

Parsons (not the estate) would have been entitled to the proceeds. *Id*. at *2-3.  However, Parsons

argued that there was a mutual mistake of fact as to the effect of the agreement, and that the

agreement should be reformed to make it a true lease. *Id*. at *3-4.  The bankruptcy court rejected the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

21

reformation request because: (a) a bankruptcy trustee's status as a hypothetical lien creditor destroys

the mutuality required for reformation that may otherwise be present in a mutual mistake by the

debtor and a third party; and (b) in bankruptcy, the equities favor allowing property into the estate so

that it can be distributed ratably to similarly situated creditors per the priority scheme established in

the Bankruptcy Code:

> While a request to reform the contract may be appropriate to prevent
> an injustice as between the parties to a contract, *see, e.g. U.S. Bank
> National Assoc. v. Kuenzli*, 134 Idaho 222, 999 P.2d 877, 882 (Idaho
> 2000), the rights of others are adversely impacted under these facts.
> Put another way, the "equities" presented here are different than in the
> classic situation where one party to a contract seeks reformation of its
> terms to give it true effect based upon the existence of an alleged
> mutual mistake as against the other party to the contract. As a matter
> of law, Plaintiff does not stand in the same shoes as Debtors, even if a
> mutual mistake can be established. Instead, Plaintiff is a representative
> of the interests of the bankruptcy estates and the unsecured creditors,
> *see* 11 U.S.C. § 541(a), and is clothed with the rights of a hypothetical
> third-party lien creditor in challenging the asserted secured interests of
> others, *see* 11 U.S.C. § 544(a)(1). The policies of the Code require the
> Court to reject a request for equitable relief, the results of which defeat
> the statutory mandate that creditors holding similar claims be treated in
> the same fashion. *See Begier v. I.R.S.*, 496 U.S. 53, 57, 110 S. Ct.
> 2258, 110 L.Ed.2d 46 (1990).

*Pro-Ag*, 2000 WL 33712201 at *4.

Similarly, in *Field v. Henshaw (In re Henshaw)*, 569 B.R. 800, 802 (Bankr. D. Haw. 2017), a

deed granted by a debtor reflected that the property was transferred by the debtor but as a joint tenant

with the grantee.  The other joint tenants argued that the debtor intended to transfer the entire interest

in the property. *Id.*  The trustee commenced an adversary proceeding to establish the estate's interest

in the property and the other party sought to reform the deed to reflect the parties' true intention. *Id.*

at 803.  The bankruptcy court denied the reformation request and granted summary judgment in

favor of the trustee because the trustee's *bona fide* purchaser status under section 544(a) cut off any

reformation remedy or defense that might have otherwise been available under state law. *Id.* at 805.

The other bankruptcy cases on the topic of reformation are in accord with *Henshaw* and *Pro-*

*Ag. See, e.g., Schaechter v. Madeoy (In re Madeoy)*, 551 B.R. 172, 177-79 (D. Md. 2016) (denying a

request to reform a deed of trust that described the wrong collateral because reformation would

DOCS_SF:96736.4 32274/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  compromise the superior rights the trustee holds by way of the strong arm provisions under section

2  544(a) of the Bankruptcy Code); *Bank of Am., N.A. v. Gallo* (*In re Gallo*), 539 B.R. 88, 92 and 93

3  (Bankr. E.D.N.C. 2015) (avoiding *lis pendens* filed by bank seeking to reform deed of trust, holding

4  postpetition reformation of deed barred by trustee's strong-arm powers under section 544(a)); *In re*

5  *Law Developers, LLC*, 404 B.R. 136 (Bankr. E.D.N.C. 2008) (refusing to reform a deed of trust even

6  though reformation would be proper outside of bankruptcy because the trustee has the rights of a

7  *bona fide* purchaser, and the debtor's knowledge of the mistake is not imputed to it); *Peebles v.*

8  *Commercial Credit Corp. (In re Peebles)*, 197 B.R. 799, 801-802 (Bankr. W.D. Pa. 1996) (refusing

9  to reform pre-petition mortgage in a chapter 7 case because a trustee has the status of a *bona fide*

10  purchaser, and "is not charged with any actual knowledge that the prepetition debtor may have had

11  as to a mistake in the description in Commercial Credit's mortgage"); *Crestar Bank v. Neal (In re*

12  *Kitchin Equip. Co. of Virginia, Inc.)*, 960 F.2d 1242, 1249 (4th Cir. 1992) (refusing to reform a UCC

13  filing because "the mutuality of the mistake, if any, has been destroyed by the intervening Chapter 7

14  petition in bankruptcy, which gave the trustee the avoiding powers of a hypothetical lien creditor

15  without knowledge of agreements between the parties"); *Northeastern Bank of Pennsylvania v.*

16  *Clark (In re White Beauty View, Inc.)*, 81 B.R. 290, 292 (Bankr. M.D. Pa. 1988) (refusing to reform

17  a mortgage because one party had filed for bankruptcy and trustee's rights had intervened).

18      Defendants will assert that the above cases are not relevant or applicable in this case because

19  they all involve transactions with the debtor and that the Fieldbrook Assignment was only between

20  Elkwood and Fieldbrook.  That argument must be rejected as "splitting" the Note alters the

21  obligations and burdens of each of the Debtors (jointly and severally liable as co-obligors under the

22  Note, as drafted) and alters the contribution and reimbursement rights between them.  However even

23  if Defendants' argument were correct, whether or not the debtor is a party to the agreement or

24  documents sought to be reformed is irrelevant.  The cases on which the Trustee relies focus on his

25  status as a hypothetical *bona fide* purchaser, not on the rights of the debtor or the debtor's status as a

26  party to the document sought to be reformed.

27      Again, Defendants will also argue that the Trustee's "strong arm" argument is to no avail

28  because, as a hypothetical *bona fide* purchaser of the Rexford Home, "the Trustee was deemed to

23

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

have had constructive notice that Elkwood claimed an interest in the Rexford Home by virtue of all these recorded documents, especially the Rexford Foreclosure Sale Deed to Elkwood [citations]." However, Defendants' argument misses the mark. As cited and discussed above, the Trustee cannot have constructive notice of a void transaction.

## V.

## DEFENDANT'S AFFIRMATIVE DEFENSES ARE ALL IRRELEVANT OR INVALID

The Trustee, as the moving party, is not required to anticipate and refute Defendants' asserted Affirmative Defenses. *Consumer Cause, Inc. v. Smilecare*, 91 Cal. App. 4th 454, 473 (2001).  Nonetheless, in anticipation of Defendants' assertion of such Affirmative Defenses, the Trustee demonstrates that they are irrelevant and/or invalid:

A.    First Affirmative Defense (¶ 119):  "The Complaint on file herein does not state a claim upon which relief may be granted as against the Elkwood Defendants."  Trustee's Response: The Court already dismissed Defendants' motion to dismiss and held that the Trustee stated a claim upon which relief may be granted.

B.    Second Affirmative Defense (¶ 120): "The trustee's deeds upon sale under which the Elkwood Defendants acquired the Rexford and Chalette Homes that are the subject of the Complaint recite that there was compliance with all statutory notice requirements, which is conclusive evidence of compliance pursuant to the provisions of California Civil Code Section 2924(c) that operates to preclude the relief requested by the Complaint."  Trustee's Response: The filing and recordation of void documents do not confer the filing party with anything. *See* discussion in Section IV.D above. The presumptions afforded by California Civil Code Section 2924(c) only relate to the adequacy of notice, not that the substantive foreclosure or sale requirements were satisfied in accordance with applicable law.  In addition, the Court already ruled on this issue in connection with Defendants' two prior motions to dismiss.

C.    Third Affirmative Defense (¶ 121): "Plaintiff has failed to tender the amount that was due and owing to Elkwood at the time of the Rexford Foreclosure Sale and all amounts expended by Elkwood in connection with that Foreclosure Sale, thereby precluding any right to set aside that Foreclosure Sale that is the subject of the Complaint and all other remedies sought by the Complaint

24

based upon setting aside that Foreclosure Sale." <u>Trustee's Response</u>: Tender is not an element or requirement under a quiet title cause of action. *See* Memorandum Decision [Docket No. 34], pp. 21-22. Applicable California law provides that no tender is required when, inter alia, the underlying debt is void (in this case, it is nonexistent) and/or the foreclosure sale or trustee's deed is void on its face. *Chavez v. Indymac Mortgage Servs.,* 219 Cal. App. 4th 1052, 1062 (2013). In addition, the Court already ruled on this issue in connection with Defendants' two prior motions to dismiss.

D.    <u>Fourth Affirmative Defense</u> (¶ 122): "The Elkwood Defendants neither knew nor had any reason to know of deficiencies or irregularities, if any existed, in connection with the Rexford Foreclosure Sale. Elkwood paid $782,508.05 for the Rexford Home at said Foreclosure Sale by way of a credit bid in that amount and Elkwood took title to the Rexford Home subject to senior secured debt, real property taxes owed on the Rexford Home and very extensive deferred maintenance, including mold, termite damage, a leaking roof and balconies, moisture and smell in the basement, useless furniture, broken tiles, peeling paint, dying landscape, a sewer that was not working, electrical systems that were not working, leaking plumbing, a fireplace that was not working and that was not properly constructed, a lack of a garage, and an unfinished uninhabitable third story. As such, Elkwood was a *bona fide* purchaser at that Foreclosure Sale." <u>Trustee's Response</u>: After Elkwood assigned the PWB Note by way of the Fieldbrook Assignment, it no longer held any right or power to enforce the PWB Note or the rights under the Rexford DOT. Elkwood's actions were void and without any force or effect and as such can never be a bona fide purchaser for value.

E.    <u>Fifth Affirmative Defense</u> (¶ 123): "The Elkwood Defendants transferred fair value for the title to the Rexford Home and the Chalette Home at the Rexford and Chalette Foreclosure Sales, and they acted in good faith in accepting title to those Homes as a result of their credit bids at those sales. Accordingly, pursuant to 11 U.S.C. §548(c), the Elkwood Defendants have a first priority lien upon the Rexford Home and the Chalette Home, and the Elkwood Defendants are entitled to retain those Homes and all proceeds of those Homes and to retain the benefit of the same." <u>Trustee's Response</u>: Section 548(c) of the Bankruptcy Code is not applicable to the First Claim for Relief (Quiet Title) as the Trustee is not seeking to avoid any transfer. Instead, the Trustee is seeking the Court's determination that title to the Rexford Home remains in the name of Massoud for the benefit of his estate.

25

DOCS_SF:96736.4 32274/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

F. <u>Sixth Affirmative Defense</u> (¶ 124): "The Elkwood Defendants spent significant monies in connection with the Rexford and Chalette Homes, including without limitation, monies spent in (a) acquiring the PWB Note; (b) conducting the Rexford and Chalette Foreclosure Sales; (c) paying insurance, property taxes and other property-related expenses; (d) paying off liens on the Homes that were senior to the lien of the deeds of trust that secured the PWB Note; and (e) improving the Chalette Home prior to the time it was sold to a third party. In the event plaintiff is granted any relief based upon his Complaint in this action, the Elkwood Defendants are entitled to a first priority lien on the Rexford Home for any monies spent in connection with the Rexford Home (if the Rexford Foreclosure Sale is avoided), which should be paid from any proceeds of the eventual sale of the Rexford Home; an offset against any awarded damages for any monies spent in connection with the Rexford Home; and an offset against any awarded damages for any monies spent in connection with the Chalette Home." <u>Trustee's Response</u>: Defendants are not entitled to any reimbursement, offset, or claim for the expenses incurred acquiring the PWB Note or conducting a foreclosure that was void. Defendants must assume and take on such expenses as the cost of doing business. In addition, assuming the Court determines that the title of the Rexford Home is in the name of Massoud and his estate, Defendants are not necessarily entitle to reimbursement for paying insurance, property taxes, liens, or for improving the Rexford Home. At most, Defendants must file a claim, to the extent they have any claim and such claim will be reconciled by the Trustee and adjudicated by the Court to the extent necessary. In any event, this "affirmative defense" does not preclude quieting title to the Rexford Home in the Trustee, subject to the rights for Defendants (and the other defendants) in the Rexford Home.

G. <u>Seventh Affirmative Defense</u> (¶ 125): Not applicable to Rexford Home or the First Claim for Relief.

H. <u>Eighth Affirmative Defense</u> (¶ 126): To the extent that the Elkwood Defendants have any liability to the plaintiff based upon the claims set forth in the Complaint in this action, then any amounts adjudicated as owing by the Elkwood Defendants to plaintiff should be set off from the amounts owing by plaintiff to the Elkwood Defendants, as set forth in the Counterclaim of Elkwood alleged herein below. <u>Trustee's Response</u>: This is not a defense that precludes summary judgment.

26

1  In addition, and set forth in the Trustee's answer to counterclaim [Docket No. 86], the lease between

2  Massoud and Elkwood regarding the rental of the Rexford Home after the void foreclosure was a

3  sham transaction that was part of the deal between Massoud and Mr. Nourafshan to extinguish the

4  junior liens against the Rexford Home so that Massoud and his family could live in the home with

5  paying any rent.

6                                              **VI.**

7                                    <u>**CONCLUSION**</u>

8          For all of the reasons set forth herein, the Trustee is entitled to summary judgment on all of

9  the First Claim for Relief (Quiet Title) as set forth in the Complaint.  The Trustee is entitled to title

10  of the Rexford Home for the benefit of Massoud's Estate.

11  Dated:    July 9, 2018                    PACHULSKI STANG ZIEHL & JONES LLP

12

13                                    By    */s/ John W. Lucas*
                                           Jeremy V. Richards
14                                         John W. Lucas

15                                         *Counsel to David K. Gottlieb,*
                                           *Chapter 11 Trustee*

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

27

DOCS_SF:96736.4 32274/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## **DECLARATION OF JEREMY V. RICHARDS**

I, Jeremy V. Richards, declare as follows:

1.      I am an attorney at law duly authorized to practice before all of the courts of the State of California, and am a partner in the law firm of Pachulski Stang Ziehl & Jones LLP ("PSZJ"), counsel of record herein to the Trustee.  I make this Declaration in support of the *Motion for Summary Judgment on the First Claim for Relief (Quiet Title)* (the "Motion").  All capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Motion.

2.      Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of certain of the Debtor's books and records, relevant documents and other information prepared or collected by PSZJ's or the Trustee's employees and/or advisors, or my opinion based on my experience serving as counsel to the Trustee in the Debtors' chapter 11 cases.  If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion.

3.      On August 3, 2016 (the "Petition Date"), involuntary bankruptcy petitions were filed against the Debtors [Massoud Docket No. 1; Solyman Docket No. 1].

4.      The Debtors stipulated to the entry of Orders for Relief in their respective cases, which Orders for Relief were entered on or about September 12, 2016 [Massoud Docket Nos. 92 & 94; Solyman Docket Nos. 94 & 109].

5.      The Debtors stipulated to the appointment of a chapter 11 trustee for each of their bankruptcy estates, and the Trustee was appointed as chapter 11 trustee for both Debtors by orders entered on or about September 20, 2016 [Massoud Docket Nos. 104, 105, 106 & 110; Solyman Docket Nos. 94, 105, 106 & 110].

6.      A copy of the *Promissory Note*, dated March 20, 2009 (the "**PWB Note**") was produced by Pacific Western Bank ("**PWB**") to the Trustee and his advisors in response to the Order [Docket No. 251] entered by the Court on November 16, 2016, a copy of which is attached hereto as **Exhibit 1**.

DOCS_SF:96736.4 32274/001

7.    A copy of the *Business Loan Agreement*, dated March 20, 2009 (the "**Business Loan Agreement**") was produced by PWB to the Trustee and his advisors in response to the Order [Docket No. 251] entered by the Court on November 16, 2016, a copy of which is attached hereto as **Exhibit 2**.

I declare under penalty of perjury that the foregoing is true and correct and that, if called as a witness, I could and would competently testify as to all of the matters stated herein.

Executed this **9**th day of July 2018, at Los Angeles, California.

*/s/ Jeremy V. Richards*
Jeremy V. Richards

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2

DOCS_SF:96736.4 32274/001

# **EXHIBIT 1**

(PWB Note)

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $6,551,575.00 | 03-20-2009 | 02-22-2012 | 200366760 | | Port #537444 | 714 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**   Massoud Yashouafar
Solyman Yashouafar
660 South Figueroa Street, 24th Floor
Los Angeles, CA 90017

**Lender:**   Pacific Western Bank
West Covina Office
220 South Vincent Avenue
West Covina, CA 91790

**Principal Amount: $6,551,575.00**                          Date of Note: **March 20, 2009**

**PROMISE TO PAY.** Massoud Yashouafar and Solyman Yashouafar ("Borrower") jointly and severally promise to pay to Pacific Western Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Six Million Five Hundred Fifty-one Thousand Five Hundred Seventy-five & 00/100 Dollars ($6,551,575.00), together with interest on the unpaid principal balance from March 20, 2009, until paid in full.

**PAYMENT.** Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balances as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph: 2 monthly consecutive interest payments, beginning April 22, 2009, with interest calculated on the unpaid principal balances using an interest rate based on the Lender's Base Rate (currently 4.000%), plus a margin of 0.500 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 6.250%; 32 monthly consecutive principal and interest payments in the initial amount of $43,593.82 each, beginning June 22, 2009, with interest calculated on the unpaid principal balances using an interest rate based on the Lender's Base Rate (currently 4.000%), plus a margin of 0.500 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 6.250%; and one principal and interest payment of $6,274,434.10 on February 22, 2012, with interest calculated on the unpaid principal balances using an interest rate based on the Lender's Base Rate (currently 4.000%), plus a margin of 0.500 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 6.250%. This estimated final payment is based on the assumption that all payments will be made exactly as scheduled and that the Index does not change; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts under this Note. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is the Lender's Base Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 4.000% per annum. The interest rate or rates to be applied to the unpaid principal balance during this Note will be the rate or rates set forth herein in the "Payment" section. Notwithstanding any other provision of this Note, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the last payment date of the just-ending payment stream. NOTICE: Under no circumstances will the interest rate on this Note be less than 6.250% per annum or more than the maximum rate allowed by applicable law. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) increase Borrower's payments to cover accruing interest, (C) increase the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Pacific Western Bank, West Covina Office, 220 South Vincent Avenue, West Covina, CA 91790.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 5.000% of the principal and interest overdue or $10.00, whichever is greater.

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by adding a 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. After maturity, or after this Note would have matured had there been no default, the Default Rate Margin will continue to apply to the final interest rate described in this Note.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false

PWB_001816

# PROMISSORY NOTE
## (Continued)

Loan No: 200366760    Page 2

or misleading at any time thereafter.

**Death or Insolvency.** The death of Borrower or the dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

(A) a Deed of Trust dated March 20, 2009, to a trustee in favor of Lender on real property described as "Real Property located at 910 North Rexford Drive, Beverly Hills, CA 90210" and located in Los Angeles County, State of California. That agreement contains the following due on sale provision: Lender may, at Lender's option, declare immediately due and payable all sums secured by the Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

(B) a Deed of Trust dated March 20, 2009, to a trustee in favor of Lender on real property described as "Real Property located at 580 Chalette Drive, Beverly Hills, CA 90210" and located in Los Angeles County, State of California. That agreement contains the following due on sale provision: Lender may, at Lender's option, declare immediately due and payable all sums secured by the Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Each Borrower understands and agrees that, with or without notice to Borrower, Lender may with respect to any other Borrower (a) make one or more additional secured or unsecured loans or otherwise extend additional credit; (b) alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of any indebtedness, including increases and decreases of the rate of interest on the indebtedness; (c) exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any security, with or without the substitution of new collateral; (d) apply such security and direct the order or manner of sale thereof, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine; (e) release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; and (f) determine how, when and what application of payments and credits shall be made on any other indebtedness owing by such other Borrower. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this

PWB_001817

Loan No: 200366760

**PROMISSORY NOTE**
**(Continued)**

Page 3

Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, EACH BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. EACH BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

X _____        X _____
Massoud Yashouafar                          Solyman Yashouafar

LASER PRO Lending, Ver. 5.43.00.003 Copr. Harland Financial Solutions, Inc. 1997, 2009. All Rights Reserved. - CA I:\HARPWIN\CFI\WIN\CFI\LPL\D20.FC TR-10160 PR-10

PWB_001818

# **EXHIBIT 2**

(Business Loan Agreement)

# JSINESS LOAN AGREEMEN

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $6,551,575.00 | 03-20-2009 | 02-22-2012 | 200366760 | | Port #537444 | 714 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this Agreement to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

Borrower:  Massoud Yashouafar
Solyman Yashouafar
660 South Figueora Street, 24th Floor
Los Angeles, CA  90017

Lender:  Pacific Western Bank
West Covina Office
220 South Vincent Avenue
West Covina, CA  91790

THIS BUSINESS LOAN AGREEMENT dated March 20, 2009, is made and executed between Massoud Yashouafar and Solyman Yashouafar ("Borrower") and Pacific Western Bank ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

TERM. This Agreement shall be effective as of March 20, 2009, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

CONDITIONS PRECEDENT TO EACH ADVANCE. Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

Loan Documents. Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

Payment of Fees and Expenses. Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

Representations and Warranties. The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

No Event of Default. There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

REPRESENTATIONS AND WARRANTIES. Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any indebtedness exists:

Business Activities. Massoud Yashouafar maintains an office at 660 South Figueora Street, 24th Floor, Los Angeles, CA  90017. Unless Massoud Yashouafar has designated otherwise in writing, the principal office is the office at which Massoud Yashouafar keeps its books and records including its records concerning the Collateral. Massoud Yashouafar will notify Lender prior to any change in the location of Massoud Yashouafar's principal office address or any change in Massoud Yashouafar's name. Massoud Yashouafar shall do all things necessary to comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Massoud Yashouafar and Massoud Yashouafar's business activities.

Solyman Yashouafar maintains an office at 660 South Figueora Street, 24th Floor, Los Angeles, CA  90017. Unless Solyman Yashouafar has designated otherwise in writing, the principal office is the office at which Solyman Yashouafar keeps its books and records including its records concerning the Collateral. Solyman Yashouafar will notify Lender prior to any change in the location of Solyman Yashouafar's principal office address or any change in Solyman Yashouafar's name. Solyman Yashouafar shall do all things necessary to comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Solyman Yashouafar and Solyman Yashouafar's business activities.

Assumed Business Names. Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

Authorization. Borrower's execution, delivery, and performance of this Agreement and all the Related Documents do not conflict with, result in a violation of, or constitute a default under (1) any provision of any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

Financial Information. Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

Legal Effect. This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

Properties. Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

Hazardous Substances. Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the

PWB_001809

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Additional Requirements.**

**BORROWER'S FINANCIAL REQUIREMENTS:**

**PERSONAL FINANCIAL STATEMENTS.** Borrower shall provide to Lender, as soon as available, but in no event later than thirty (30) days after your applicable tax return filing date, a self-prepared personal financial statement.

**TAX RETURNS.** Borrower shall provide to Lender, as soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns including all Schedules and K-1's, if applicable. If extensions are filed, copies of such extensions are to be provided immediately upon filing.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge,

## BUSINESS LOAN AGREEMENT
**(Continued)**

Loan No: 200366760

Page 3

levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation or guideline, or the interpretation or application of any thereof by any court or administrative or governmental authority (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (B) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, or (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change ownership, dissolve or transfer or sell Collateral out of the ordinary course of business.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any

# BUSINESS LOAN AGREEMENT
## (Continued)

other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The death of Borrower or the dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**INTEGRATION.** The parties agree that (a) this Agreement, together with all of the Related Documents, represents the final agreement between the parties, and therefore incorporates all negotiations of the parties hereto (b) there are no unwritten oral agreements between the parties, and (c) this Agreement may not be contradicted by evidence of any prior, contemporaneous, or subsequent oral agreements or understandings of the parties.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Page 5

services.  Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.**  Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.**  Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender.  Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters.  Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests.  Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests.  Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan.  Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.**  This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions.  This Agreement has been accepted by Lender in the State of California.

**Choice of Venue.**  If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**Joint and Several Liability.**  All obligations of Borrower under this Agreement shall be joint and several, and all references to Borrower shall mean each and every Borrower.  This means that each Borrower signing below is responsible for all obligations in this Agreement.

**No Waiver by Lender.**  Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender.  No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right.  A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement.  No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions.  Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.**  Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement.  Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.  For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address.  Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.**  If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any person or circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other person or circumstance.  If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable.  If the offending provision cannot be so modified, it shall be considered deleted from this Agreement.  Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.**  All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns.  Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

*Survival of Representations and Warranties.*  Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents.  Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.**  Time is of the essence in the performance of this Agreement.

**DEFINITIONS.**  The following capitalized words and terms shall have the following meanings when used in this Agreement.  Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America.  Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require.  Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code.  Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.**  The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.**  The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.**  The word "Borrower" means Massoud Yashouafar and Solyman Yashouafar and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.**  The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a

## BUSINESS LOAN AGREEMENT
### (Continued)

security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Pacific Western Bank, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note executed by Massoud Yashouafar and Solyman Yashouafar in the principal amount of $6,551,575.00 dated March 20, 2009, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED MARCH 20, 2009.

BORROWER:

X _____    X _____
Massoud Yashouafar              Solyman Yashouafar

BUSINESS LOAN AGREEMENT
(Continued)

Loan No: 200366760

Page 7

LENDER:

PACIFIC WESTERN BANK

By: _____
     Authorized Signer

LASER PRO Lending, Ver. 5.42.00.103  Copr. Harland Financial Solutions, Inc. 1997, 2005.  All Rights Reserved.  - CA  E:\HARPWB\CFI\H\MCH\LPL\C40.FC  TR-10160  PR-10

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 150 California Street, 15th Floor, San Francisco, CA 94111.

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION AND MOTION OF DAVID K. GOTTLIEB, CHAPTER 11 TRUSTEE, FOR SUMMARY JUDGMENT ON FIRST CLAIM FOR RELIEF (QUIET TITLE) AGAINST DEFENDANTS ELKWOOD ASSOICATES, LLC AND FIELDBROOK, INC.; DECLARATION OF JEREMY RICHARDS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (date) **July 9, 2018**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Timothy C Aires      tca@arlawyers.com, mdkhan@arlawyers.com
- Henry S David      hdavid@davidfirm.com, 8163836420@filings.docketbird.com
- John W Lucas      jlucas@pszjlaw.com, ocarpio@pszjlaw.com
- Daniel J McCarthy      dmccarthy@hillfarrer.com, spadilla@hillfarrer.com;docket@hillfarrer.com
- Ashley M McDow      amcdow@foley.com, Khernandez@foley.com;Ffarivar@foley.com
- Jeremy V Richards      jrichards@pszjlaw.com, bdassa@pszjlaw.com;imorris@pszjlaw.com
- Ronald N Richards      ron@ronaldrichards.com, morani@ronaldrichards.com,justin@ronaldrichards.com
- United States Trustee (SV)      ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On (date) **July 9, 2018**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) **July 9, 2018**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

> **VIA OVERNIGHT MAIL**
> The Honorable Geraldine Mund
> United States Bankruptcy Court
> 21041 Burbank Blvd., Suite 312, Courtroom 303,
> Woodland Hills, CA 91367

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 9, 2017 | Oliver Carpio | /s/ Oliver Carpio |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

**SERVED VIA US MAIL**

| | |
|---|---|
| Daniel J. McCarthy<br>Hill Farrer & Burill LLP<br>300 South Grand Avenue, 37th Floor<br>Los Angeles, CA  90071-3147<br>*Attorneys for Elkwood Associates, LLC and Fieldbrook, Inc.* | Henry S. David<br>The David Firm<br>617 W 7th St Ste 702<br>Los Angeles, CA  90071<br>*Attorneys for Israel Abselet and Howard Abselet* |
| Ronald Richards<br>Law Offices of Ronald Richards & Associates<br>PO Box 11480<br>Beverly Hills, CA  90213<br>*Attorneys for Soda Partners, LLP* | Merdaud Jafarnia<br>McCarthy & Holthus, LLP<br>1770 Fourth Avenue<br>San Diego, CA  92101<br>*Attorneys for Quality Loan Service Corporation and Chase Manhattan Mortgage Company* |
| Timothy C Aires<br>Aires Law Firm<br>6 Hughes, Ste 205<br>Irvine, CA  92618<br>*Attorneys for DMARC 2007-CD5 Garden Street LLC* | State Street Bank and Trust Company<br>Attn: Director or Officer<br>1 Lincoln Street<br>Boston, MA  0211 |
| Mark M. Sharf, Esq.<br>Merritt, Hagen & Sharf, LLP<br>5950 Canoga Ave, #400<br>Woodland Hills, CA 91367<br>*Attorneys for Massoud Aaron Yashouafar* | Scott Wyman<br>15915 Ventura Blvd #304<br>Encino, CA  91436-2736<br>*Attorneys for Citivest Financial Services, Inc.* |
| Massoud Aaron Yashouafar<br>12730 Montana Ave.<br>Los Angeles, CA 90049 | Massoud Aaron Yashouafar<br>P.O. Box 261847<br>Encino, CA 91426 |
| The Honorable Geraldine Mund<br>United States Bankruptcy Court<br>21041 Burbank Blvd., Suite 312, Courtroom 303<br>Woodland Hills, CA 91367 | |

**SERVED VIA E-MAIL**

| | |
|---|---|
| Daniel J. McCarthy<br>Email: dmccarthy@hillfarrer.com<br>*Attorneys for Elkwood Associates, LLC and Fieldbrook, Inc.* | Henry S. David<br>Email: hdavid@davidfirm.com<br>*Attorneys for Israel Abselet and Howard Abselet* |
| Ronald Richards<br>Email: ron@ronaldrichards.com<br>*Attorneys for Soda Partners, LLP* | Merdaud Jafarnia<br>Email: mjafarnia@mccarthyholthus.com<br>*Attorneys for Quality Loan Service Corporation and Chase Manhattan Mortgage Company* |
| Timothy C Aires<br>Email: tca@arlawyers.com<br>*Attorneys for DMARC 2007-CD5 Garden Street LLC* | Mark M. Sharf, Esq.<br>Email: mark@sharflaw.com<br>*Attorneys for Massoud Aaron Yashouafar* |
| Scott Wyman<br>Email: scottwyman2k@yahoo.com<br>*Attorneys for Citivest Financial Services, Inc.* | |