**FILED & ENTERED**

**JAN 25 2019**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY** Fisher    **DEPUTY CLERK**

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>SOLYMAN YASHOUAFAR and MASSOUD AARON YASHOUAFAR,<br><br>Debtors. | CHAPTER 11<br><br>Case No.: 1:16-bk-16-12255-GM<br><br>Adv No.: 1:17-ap-01040-MT<br><br>**MEMORANDUM RE MOTION TO DISMISS THE FIRST AMENDED COUNTER-COMPLAINT**<br><br>Date:    December 11, 2018<br>Time:   9:30 a.m.<br>Courtroom:  302 |
| DAVID K. GOTTLIEB, as Chapter 11 Trustee,<br>            Plaintiff,<br>v.<br>ELKWOOD ASSOCIATES, LLC., *et al.*,<br>            Defendants. | |
| AND RELATED COUNTER- AND CROSS-ACTIONS | |

Introduction

Sina Abselet and Howard Abselet (the "Abselets") are creditors in the underlying involuntary bankruptcy cases of Solyman Yashouafar ("Solyman") and his brother

-1-

1  Massoud Yashouafar ("Massoud") (collectively, the "Debtors"). While the dealings
2  between the Debtors and the Abselets extend beyond the facts before the Court in this
3  adversary, this lawsuit centers on the actions taken by the Debtors and Debtors' family
4  members with respect to two pieces of real property: 580 Chalette Drive, Beverly Hills,
5  CA (the "Chalette Property") and 910 Rexford Drive, Beverly Hills, CA (the "Rexford
6  Property"). Massoud's brother-in-law is defendant Jack Nourafshan. Jack Nourafshan
7  allegedly used certain entities owned by himself and his two brothers to take the actions
8  described below. Those entities are Elkwood Associates, LLC ("Elkwood"), Fieldbrook,
9  Inc., a California Corporation ("Fieldbrook"), and Reliable Properties, Inc., a California
10 Corporation ("Reliable") (collectively with Jack Nourafshan, the "Nourafshan
11 Defendants").[1]

12     Certain claims that the Abselets bring under this First Amended Counterclaim
13 ("FACC") seek similar or identical relief to that sought by David Gottlieb, the chapter 11
14 trustee in the jointly administered lead bankruptcy cases and plaintiff in this adversary
15 action ("Trustee"). The Nourafshan Defendants, through their attorneys, filed this Motion
16 to Dismiss the Abselets' First Amended Counterclaim (the "Motion").

17 <u>Standard</u>

18     A motion to dismiss under Civil Rule 12(b)(6) challenges the sufficiency of the
19 allegations set forth in the complaint. "A Rule 12(b)(6) dismissal may be based on
20 either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged
21 under a cognizable legal theory.'" <u>Johnson v. Riverside Healthcare Sys.</u>, 534 F.3d
22 1116, 1121 (9th Cir. 2008) (*quoting* <u>Balistreri v. Pacifica Police Dept.</u>, 901 F.2d 696, 699

---

[1] This memorandum is accompanied by a separate memorandum on cross-motions for summary judgment, and the naming of parties is not necessarily consistent with that separate decision.

(9th Cir. 1990)).

In resolving a Civil Rule 12(b)(6) motion to dismiss, the court must construe the complaint in the light most favorable to the plaintiff, and accept all well-pleaded factual allegations as true. Johnson, 534 F.3d at 1122; Knox v. Davis, 260 F.3d 1009, 1012 (9th Cir. 2001). On the other hand, the court is not bound by conclusory statements, statements of law, and unwarranted inferences cast as factual allegations. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-57 (2007); Clegg v. Cult Awareness Network, 18 F.3d 752, 754-55 (9th Cir. 1994).

### First Counterclaim: Declaratory Relief

The allegations in the first claim for relief mirror those in the Trustee's first claim, which survived a separate motion to dismiss and a summary judgment motion by the Nourafshan Defendants. The first claim alleges that the foreclosure of the Rexford Property was void because Elkwood assigned its entire interest in the note it purchased from Pacific Western Bank ("PWB Note") to Fieldbrook in the days before the foreclosure of the Rexford Property. The Abselets allege that therefore Elkwood had no right to foreclose or to credit bid at the foreclosure sale. The Nourafshan Defendants argue that this action for declaratory judgment is essentially an action for quiet title, and that the Abselets lack standing.

Although declaratory relief is not typically an independent claim, but rather a remedy, declaratory relief can be a separate claim for relief under certain circumstances, such as when Plaintiff seeks relief not available in a quiet title action. Davies v. Deutsche Bank Nat'l Tr. Co., 2012 WL 370689, at *6 (B.A.P. 9th Cir. Jan. 12, 2012), aff'd, 565 F. App'x 630 (9th Cir. 2014). An action for declaratory judgment is

appropriate here. The Abselets dropped their claim for quiet title due to a concern over whether the Abselets, as junior lienholders, may quiet title in a third party (the Trustee). If that concern is founded, then the Abselets are seeking relief that could not be granted in a quiet title action.

The Nourafshan Defendants argue that the Abselets lack standing to bring this claim because, as a junior lienholder, they are differently situated from the Trustee and therefore cannot rely upon Yvanova v. New Century Mortg. Corp. for standing. 62 Cal. 4th 919 (2016). Yvanova did not address the standing of junior lienholders who were prejudiced by an allegedly void foreclosure. However, if the allegations in the Abselets' countercomplaint are true, the Abselets were prejudiced as a result of the allegedly void foreclosure because they lost their security interests in the Rexford Property despite being fully secured according to the alleged value of the property. The Nourafshan Defendants focus their argument on whether the mere *assignment* of the note prejudiced the Abselets. As stated in the Court's accompanying ruling on the cross-motions for summary judgment, CM/ECF docket number 191, the Yvanova case not only creates an action to challenge assignments—it also recognizes an action to challenge the allegedly void foreclosure itself. See generally Yvanova, 62 Cal. 4th 919 (2016); Glaski v. Bank of Am., 218 Cal. App. 4th 1079, 1101 (2013) ("[W]here a plaintiff alleges that the entity lacked authority to foreclose on the property, the foreclosure sale would be void."). Similarly, the first counterclaim does not allege damage from the assignment, but from the subsequent foreclosure which wiped out the Abselets' security interests. Therefore, the Abselets have suffered sufficient injury for standing. The first claim for relief is sufficient to state a claim for the declaratory relief sought.

<u>Second Counterclaim</u>

The second counterclaim is "based on the counterfactual contention of the Nourafshan Entities that Elkwood assigned only the New Solyman Obligation and the PWB Chalette DOT to Fieldbrook." <u>FACC</u> ¶ 101. The Court has considered the theory that the note was bifurcated and has rejected it in its ruling on the cross-motions for summary judgment. However, since that is not yet a final ruling because the appeal period on that ruling has not yet run, the Court will address the allegations as stated in the FACC.

The Abselets seek a declaration that the Rexford foreclosure sale was "void" on three grounds. First, the complaint states that the bifurcated "New Massoud Obligation" was unsecured. Second, the complaint avers that any partial assignment was invalid because such assignment would have required the consent of the Debtors and of the junior lienholders. Lastly, the Abselets argue that the Nourafshan Defendants did not properly record a Notice of Default or a Notice of Sale with respect to the "New Massoud Obligation."

The Abselets' argument for how the debt was unsecured is not a plausible reading of the Rexford deed of trust. The Abselets argue that the definition sections of the relevant loan documents do not create a security interest in the "New Massoud Obligation." The PWB Rexford DOT defines "INDEBTEDNESS" as "all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents." The Abselets argue that the New Massoud Obligation is not the "indebtedness" secured by the Rexford DOT

because it is not "all" of the amounts due under the PWB Note or "Related Documents." Opposition, 12:15-13-3. This labored reading of the loan document is not plausible, as the Rexford DOT also secured "any and all obligations under the note." FACC Ex. 8. Furthermore, as explained below, the Abselets have not adequately alleged the existence of a separate New Massoud Obligation.

The second theory for the second counterclaim also does not state a plausible claim for relief. The bifurcation of the note, if one occurred, would have been prejudicial to junior lienholders, including the Abselets. However, the Abselets have not provided any legal authority to support their contention that a "material split" occurred that would have required the consent of junior lienholders. The authority relied upon by the Abselets does not support the remedy they seek. In Gluskin v. Atl. Sav. & Loan Assn., the court held that a lender and a borrower may not bilaterally make a material modification in the loan to which the seller has subordinated without the knowledge and consent of the seller to that modification if the modification materially affects the seller's rights. 32 Cal. App. 3d 307, 314 (Ct. App. 1973). Gluskin arose in the context of a subordination agreement which was essentially a three-way transaction. The Gluskin court recognized "the vulnerable position in which a seller who agrees to subordinate his purchase money deed of trust may find himself." Id. at 313. The court stated that there were "strong public policy reasons to protect the seller in subordination situations." Id. This is not a subordination, and the Gluskin holding does not apply to the current situation.

The other authority cited by the Abselets similarly focuses on subordination of the senior lien, particularly in the context of subordination agreements in construction loans.

In fact, the treatise cited by the Abselets seems to refute their own theory. After discussing subordination in the context of construction loans, Miller & Starr states that "[t]he possible argument from these earlier cases, that all junior lienors, not solely subordinating sellers, should be able to gain priority over modifications to the senior lien made without their consent, has been rejected." Miller & Starr, California Real Estate, 4 Cal. Real Est. § 10:102 (4th ed. August 2018 Update). This leading treatise emphasizes that "[t]he senior lienor owes 'no express or implied contractual duties' to a person who extends credit in a junior position without its consent." Id. All the cited cases involved subordination agreements, which place the subordinating lienholder "in an especially vulnerable position." Friery v. Sutter Buttes Sav. Bank, 61 Cal. App. 4th 869, 876 (1998). Notably, none of the cases cited provided a party with the relief sought by the Abselets: a declaration that the foreclosure was void.

  The third theory raised in support of the second counterclaim is that the foreclosure was void because, assuming the PWB Note was split into two separate loans, the Elkwood Defendants were required to file a new Notice of Default and a Notice of Trustee's Sale with respect to each of the newly created loans (the "New Massoud Obligation" and the "New Solyman Obligation").

  While all well-pleaded facts are assumed to be true on a motion under Fed. R. Civ. P. 12(b)(6), the Court does not assume the truth of conclusory allegations. Kwan v. SanMedica Int'l, 854 F.3d 1088, 1096 (9th Cir. 2017). "Legal conclusions may provide a framework for a complaint, but they must be supported by factual allegations." Id. It is unclear how new obligations could have been created absent a novation, and the FACC does not contain allegations to support the occurrence of a novation.

A novation is the substitution of a new obligation for an existing one. <u>Fanucchi & Limi Farms v. United Agri Prod.</u>, 414 F.3d 1075, 1081-82 (9th Cir. 2005). "The <u>intention of the parties</u> to extinguish the prior obligation and to substitute a new agreement in its place must clearly appear." <u>Id.</u> (emphasis added). The FACC does not make any allegations regarding the intent of the Debtors to create a novation. In fact, in their opposition, the Abselets seem to accept that there was no novation, but they then go on to say "[a]ssuming, *arguendo*, that this novation was effective. . . the old obligation is thereby extinguished. . . [O]ne cannot foreclose on an extinguished or otherwise unenforceable assignment." <u>Opposition</u>, Doc. 168 18:14-16. The Court will not assume, *arguendo*, facts that have not been well pled. The allegation that two separate notes were created is therefore conclusory and not entitled to the assumption of truth. This deficiency affects all three theories of the second counterclaim, as well as other counterclaims as described below. No party to this litigation seeks a finding that a novation of this kind occurred, so it is extremely unlikely that this alternately pled theory will ever become relevant.

The motion is GRANTED as to the second counterclaim, as stated above.

Fourth Counterclaim: Conversion of Chalette Proceeds

The FACC seeks recovery for conversion of the proceeds of the Chalette Property. The elements of the tort of conversion are "(1) the plaintiff's ownership or right to possession of personal property; (2) the defendant's disposition of the property in a manner that is inconsistent with the plaintiff's property rights; and (3) resulting damages." <u>Fremont Indem. Co. v. Fremont Gen. Corp.</u>, 148 Cal. App. 4th 97, 119 (2007). The Motion argues that the FACC fails to state a cognizable claim for

conversion because conversion requires that the plaintiff "has the right of immediate possession." PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP, 150 Cal. App. 4th 384, 395 (2007).

The Abselets base their conversion claim on the theory that the Chalette foreclosure was void because 1) the consent of the Debtors and the junior lienholders was not obtained; 2) the "New Solyman Obligation" was unsecured, and 3) no notice of default or notice of sale was recorded with respect to the New Solyman Obligation. FACC 40:4-13. As discussed above with respect to the Rexford Property,[2] each of these arguments fail. Consent of junior lienholders is not required to modify a lien. Even if it were, the Abselets have not pled facts to support their theory that the PWB Note was split into two separate contracts because there are no allegations of the Debtors' intent, which would be required to create a novation. The allegation that the "PWB Note was divided into two, separate loans" is therefore not entitled to the assumption of truth for purposes of this motion to dismiss. FACC 40:1-3.

Furthermore, because the Abselets' action seeks to obtain the proceeds of the subsequent sale to a bona fide purchaser, not of the foreclosure sale itself, the Abselets have not adequately pled that they held a security interest in the property at the time of the sale; that security interest was removed in the Chalette foreclosure sale, and the Abselets have not pled any theory under which the Chalette foreclosure would be declared invalid. The Abselets have failed to state a claim for conversion because they have not sufficiently alleged facts demonstrating their ownership or right to possession of the Chalette Proceeds. The Motion is granted as to the fourth counterclaim.

---

[2] The Chalette Deed of Trust contains identical language stating that the deed of trust secures performance of "any and all obligations under the note." FACC Ex. 7.

### Fifth Counterclaim: Money Had and Received – Chalette Proceeds

A claim for money had and received is an equitable claim that arises if "the defendant is indebted to the plaintiff in a certain sum for money had and received by the defendant for the use of the plaintiff." Schultz v. Harney, 27 Cal. App. 4th 1611, 1623 (1994), as modified on denial of reh'g (Sept. 29, 1994). "As juries are instructed in CACI No. 370, the plaintiff must prove that the defendant received money 'intended to be used for the benefit of [the plaintiff],' that the money was not used for the plaintiff's benefit, and that the defendant has not given the money to the plaintiff. Avidor v. Sutter's Place, Inc., 212 Cal. App. 4th 1439, 1454 (2013).

The fifth counterclaim is based upon the same theories as the fourth counterclaim. As described above, those theories are insufficiently pled. The motion is GRANTED as to the fifth counterclaim.

### Sixth Counterclaim: Unjust Enrichment

In California, the majority of courts do not recognize a cause of action for unjust enrichment. Forcellati v. Hyland's, Inc., 876 F. Supp. 2d 1155, 1166 (C.D. Cal. 2012) ("We agree with Defendants that the majority of state and federal district courts in California do not recognize unjust enrichment as a freestanding claim."); Mckell v. Wash. Mut., Inc., 142 Cal.App. 4th 1457, 1490 (2006). Those courts instead treat unjust enrichment as a remedy under California law. Swain v. CACH, LLC, 699 F. Supp. 2d 1109, 1115 (N.D. Cal. 2009).

The Abselets argued persuasively at oral argument that the distinction drawn in the case law is largely semantic. Hendricks v. StarKist Co., 30 F. Supp. 3d 917, 933, fn. 9 (N.D. Cal. 2014) ("[T]he split in the authorities on the existence of a 'cause of action'

for 'unjust enrichment' under California law is essentially founded on semantics, drawing a distinction—between unjust enrichment, restitution, and quasi-contract—without a difference. Regardless of whether the claim is labeled one for unjust enrichment, restitution, or some other equitable theory such as quasi-contract or constructive trust, the legal basis for relief is recognized in California law."). The Abselets rely on a recent California Supreme Court case in arguing that such an action exists, regardless of the title of the action:

> An individual who has been unjustly enriched at the expense of another may be required to make restitution. Where the doctrine applies, the law implies a restitutionary obligation, even if no contract between the parties itself expresses or implies such a duty. . . Though this restitutionary obligation is often described as quasi-contractual, a privity of relationship between the parties is not necessarily required.

Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C., 61 Cal. 4th 988, 998 (2015). The Court agrees that this action can move forward as a quasi-contract claim under Hartford.

Because this was the only argument raised against the sixth counterclaim by the Motion, the Motion is DENIED as to the sixth counterclaim.

### Eighth Counterclaim: Conspiracy to Chill Bidding

Fraudulent actions of a trustee or beneficiary during foreclosure proceedings in violation of Cal. Civ. Code. 2924h can give rise to a tort action. Banc of Am. Leasing & Capital, LLC v. 3 Arch Tr. Servs., Inc., 180 Cal. App. 4th 1090, 1103 (2009). The tort action is a "tort in essence," which is akin to a claim for negligence *per se*. Rezek v. City of Tustin, No. SACV 11-01601 DOC, 2012 WL 5829928, at *7 (C.D. Cal. Nov. 15, 2012).

> A tort in essence is the breach of a nonconsensual duty owed another. Violation of a statutory duty to another may

> therefore be a tort and violation of a statute embodying a public policy is generally actionable even though no specific civil remedy is provided in the statute itself. Any injured member of the public for whose benefit the statute was enacted may bring the action. . . .
>
> . . . Civil Code section 2924h, subdivision (g) criminalizes "any act ... which would operate as a fraud or deceit upon any beneficiary ... or junior lienor ...." South Bay established the requisite fraudulent conduct: the agreement between Riviera and Archer to postpone the foreclosure sales; the postponements of the sale because bidders ready and able to purchase were present; and the misrepresentation about the amount owed to Riviera. South Bay, as a junior lienholder, clearly falls with the class for whose benefit the statute was enacted and therefore may use defendants' violation of the statute to establish civil liability.

South Bay Bldg. Enterprises, Inc. v. Riviera Lend-Lease, Inc., 72 Cal. App. 4th 1111, 1123-24 (1999).

The FACC alleges that the Debtors engaged in a complex fraudulent scheme to transfer assets, including the Rexford home, to family members to keep those assets out of reach of their creditors, including the Abselets. FACC ¶ 28. It alleges that the Nourafshan Defendants knew that their acts and omissions would result in no one else bidding at the foreclosure sales on the Rexford and Chalette properties. FACC ¶ 32. Sina and Howard Abselet each allegedly had liens against the Rexford and Chalette properties. FACC ¶¶ 33-34. Massoud allegedly helped broker a deal whereby his brothers-in-law, defendant Jack Nourafshan and his brothers, would purchase one of the more senior loans (the PWB Note) secured by both the Rexford and Chalette Property. FACC ¶¶ 56-69. Massoud allegedly entered into an agreement with Jack Nourafshan that: A) Jack Nourafshan would structure the foreclosures under the PWB Note so that one of his entities would be the high bidder by credit bid, but nothing more;

B) the Chalette Property would be foreclosed and quickly resold for a profit; and C) Jack Nourafshan would "rent" Massoud the Rexford Property for nominal rent, but that Massoud would not pay rent. FACC ¶ 70. The Notice of Trustee's Sale as to each property allegedly stated that the unpaid balance secured by the home was $6,569,508.05. FACC ¶¶ 72-73. Sina Abselet allegedly did not properly receive notice of the foreclosure sale. FACC ¶ 76. The FACC alleges that because the foreclosure sales were scheduled within days of each other, and because $5.8 million of the total $6,569,508.05 owed under the PWB Note was credit bid at the Chalette foreclosure, potential bidders could not have known that the minimum bid at the subsequent Rexford foreclosure would be $782,508.05 rather than the full amount of the PWB Note. FACC ¶¶ 79-82.

   Elkwood was the successful bidder at the Rexford Foreclosure with a $782,508.05 credit bid, the amount remaining owing under the PWB Note. FACC ¶ 82. The fair market value of the Rexford home was allegedly between $12 and $15 million. FACC ¶ 83. Elkwood's successful bid took the Rexford Property subject to the senior liens of Chase, Tri-Center, and State Street. The amounts of those senior liens as of the date of the Rexford foreclosure are not stated, but the FACC alleges that the $782,508.05 winning bid was "many millions less than the value of the Rexford Home, net the amounts owed on the liens that were senior to the PWB Rexford DOT." FACC ¶ 82(C) (emphasis added). Additionally, one of those senior liens, held by Tri-Center in an amount of approximately $2 million, was allegedly satisfied months before the foreclosure sale, but not recorded. FACC ¶¶ 31(b)(1), 47, 51. The FACC alleges that the failure to record the reconveyance of the Rexford DOT was done with the purpose

of misleading potential bidders at the upcoming Rexford foreclosure into believing that the property had approximately $2,000,000 more in outstanding senior liens. FACC ¶ 52. These actions were allegedly taken in furtherance of the conspiracy to chill bidding described above.

The Abselets have alleged that they "were ready, willing, and able to bid in excess of the amount of $782,508.05 that Massoud allegedly owed Elkwood and the amount of the Soda Partners Abstracts of Judgment." FACC ¶ 84. The Abselets further allege that, but for the Nourafshan Defendants' conduct, the Abselets' claims either would have been satisfied in full or they would have been the successful bidders at the Rexford foreclosure sale. FACC ¶ 85.

The Nourafshan Defendants argue that in an action by a junior lienholder challenging a foreclosure sale based upon alleged bid chilling, plaintiff must tender the amount paid at the sale. Motion, 31:18-21; FPCI RE-HAB 01 v. E & G Investments, Ltd., 207 Cal. App. 3d 1018 (Ct. App. 1989). In FPCI, the court discussed tender as required under Arnolds Mgmt. Corp. v. Eischen, 158 Cal. App. 3d 575 (Ct. App. 1984). The tender requirement as described in Arnolds is intended to ensure that the plaintiff was damaged by the allegedly wrongful foreclosure. Id. at 580 ("[A] junior lienor must allege tender of the senior obligation as an essential element of any causes of action based upon irregularities in the sale procedure. To hold otherwise would permit plaintiffs to state a cause of action without the necessary element of damage to themselves."). The rationale behind the tender rule is that, unless another buyer was willing to pay more than the amount of the senior lienholder's credit bid, the junior lienholder would not have received anything at the foreclosure sale and could not have been damaged by the

sale. FPCI, 207 Cal. App. 3d at 1022. The same logic applies to individuals challenging a foreclosure sale: if the property owner was unable to redeem the property had the sale procedures been proper, the property owner could not have been damaged by the foreclosure sale. Id. The court in FPCI, however, acknowledges that the Arnolds rule does not paint a complete picture in cases of alleged bid chilling. The plaintiff in FPCI was a "washed out" junior lienholder seeking to recover for the foreclosing lienholder's allegedly fraudulent conduct to chill bidding. Id. The FPCI court stated, in somewhat of a departure from the Arnolds standard:

> In order to prove it was damaged by the irregularities in the foreclosure sale which dissuaded or prevented a higher bid, <u>the junior lienor would have to produce a ready, willing and able buyer who would have paid the higher price but for the wrongful conduct</u>. Otherwise, damages alleged would be speculative.

Id. at 1023 (emphasis added). The key to the holding in FPCI is that the damages requirement, which is typically satisfied by the tender rule, can be satisfied if the junior lienholder could produce a "ready, willing, and able buyer" who would have paid more than the credit bid but for the wrongful conduct. The FPCI court found no evidence of a such a buyer, and therefore found that the junior lienholder had failed "to establish provable damages caused by [the] alleged misconduct." Id. at 1024.

The Abselets rely on South Bay for the proposition that no tender is required where the remedy sought is damages, rather than to set aside the foreclosure:

> Traditionally, when there is a claim of irregularities in a foreclosure sale, the remedy is to move to set aside the sale. (4 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 9:154, pp. 505-506.) However, that is not the exclusive remedy. Fraudulent actions taken by the beneficiary can give rise to liability in tort. "When the property has been sold to a

> bona fide purchaser, even though the sale cannot be avoided, the trustor or a junior lienor ... retain[s] the right to recover damages from the trustee and the beneficiary of the foreclosing lien if there have been material irregularities in the conduct of the foreclosure."

S. Bay Bldg. Enterprises, Inc. 72 Cal. App. 4th at 1121. In South Bay, the foreclosing lienholder conspired with the trustee and property owner to repeatedly postpone the foreclosure sale and misrepresent the amount of its security interest in order to deter other bidders. The South Bay court discussed FPCI at length, then determined that South Bay Building Enterprises, the plaintiff and junior lienholder, had shown the element that was missing in FPCI—the existence of a ready, willing, and able buyer. South Bay established at trial that a third-party bidder was present at one of the postponed foreclosure sales with a cashier's check which exceeded the amount of the foreclosing creditor's claim. Id. at 1123. The presence of a ready, willing, and able buyer demonstrated that the damages were not speculative because if that buyer had been allowed to purchase the property, the junior lienholder would have received some amount of payment on behalf of its security interest.

The Abselets' assertion that tender is not required where the plaintiff seeks damages, rather than to set aside a foreclosure, is an unsettled issue of California law. There are unreported cases discussing the issue and coming to different conclusions. Compare Provident Holdings & Investments, LLC v. Cathay Bank, No. H041698, 2018 WL 6324681, at *12 (Cal. Ct. App. Dec. 4, 2018) ("Thus, although Provident argued below on multiple occasions that the tender requirement applied only to equitable set-aside actions and not to wrongful foreclosure claims seeking damages, that position is incorrect. The tender rule applies equally to damage claims.") with Nouri v. Mortg.

Lender Servs., Inc., No. B236415, 2012 WL 5338923, at *3 (Cal. Ct. App. Oct. 30, 2012) (Finding that the rationale for the tender rule does not apply in all cases seeking damages from irregular procedures in a trustee's sale, citing bid-chilling claims like South Bay and FPCI).

The Court finds that tender is not required if a junior lienholder can allege and prove that a ready, willing, and able purchaser existed who could pay in excess of the amount of the senior lienholder's credit bid. This is the natural reading of FPCI:

> Consequently, RE–HAB presents no evidence that even Waldman, who attended the foreclosure sale, could have paid a cash price large enough to pay off E & G's note of $226,047.85, let alone an additional amount which would have inured to RE–HAB's benefit. RE–HAB failed to provide any evidence that any irregularities in the sale <u>caused it damage, either through its own tender of the amount of indebtedness</u> **or** <u>that someone else was ready, willing and able to purchase the property</u> for cash sufficient to both pay off E & G's equity in its own note and provide a surplus as well.

FPCI, 207 Cal. App. 3d at 1024 (emphasis added). The emphasized portion above indicates that damages in these circumstances can be shown in this type of action by <u>either</u> 1) tendering, or 2) demonstrating that there was a ready, willing, and able purchaser who, but for the foreclosing lienholder's actions, would have paid enough for the junior lienholder to receive something on account of their security interest. This reading is also consistent with South Bay, where the court found a viable cause of action where a ready, willing, and able purchaser existed while never mentioning the tender requirement. The allegation in the FACC that the Abselets were "ready, willing, and able" to purchase the property but for the Nourafshan Defendants' actions is sufficient to defeat a motion to dismiss.

Furthermore, the Court finds that it would be inequitable to impose the tender requirement upon the Abselets in light of the allegations of fraud in connection with this bid chilling claim. The <u>Arnolds</u> court explicitly connected the tender requirement to the right of a junior lienholder to redeem or cure the delinquency before foreclosure. <u>Arnolds</u>, 158 Cal. App. 3d at 579; Cal. Civ. Code. §§ 2904, 2924c(a)(1). Here, if the Abselets' allegations are true, their ability to exercise their rights to redeem or cure were impeded by the allegedly fraudulent acts of the Nourafshan Defendants because the amount stated in the Notice of Default was significantly higher than the amount required to redeem the Rexford Property.

The allegations of bid chilling in the FACC are similar to the facts in <u>FPCI</u> and <u>South Bay</u>. The Abselets, as junior lienholders, fall within the class that Cal. Civ. Code § 2924h was intended to benefit. <u>South Bay</u>, 72 Cal. App. 4th at 1123-24. Therefore, the Abselets have sufficiently alleged damages and causation in connection with their claim for bid chilling with respect to the Rexford Property, as required by <u>South Bay</u> and <u>FPCI</u>. The nature of the claim is a tort in essence, as described in <u>South Bay</u>, for alleged violations of Cal. Civ. Code § 2924h. The Motion is DENIED as to the eighth counterclaim with respect to the Rexford Property.

As to the Chalette Property, the allegations of wrongful or fraudulent conduct are limited. The Abselets fail to allege the existence of a ready, willing, and able buyer as to the Chalette foreclosure sale. Therefore, the Motion is therefore GRANTED as pertains to the Chalette foreclosure sale.

<u>Leave to Amend</u>

The Nourafshan Defendants argue that the Court should grant the motion

to dismiss with leave to amend. If a motion is granted under Rule 12(b)(6), Rule 15(a) states that leave to amend shall be freely given when justice so requires. "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be freely given." <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962). Of the factors highlighted in <u>Foman</u>, prejudice to the opposing party carries the greatest weight. <u>Eminence Capital, LLC v. Aspeon, Inc.</u>, 316 F.3d 1048, 1052 (9th Cir. 2003).

While the Abselets amended their original counter-complaint in response to a motion to dismiss, the Nourafshan Defendants would not be unduly prejudiced by allowing another amendment.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Conclusion

As set forth above, the Motion is GRANTED as to the second, fourth, and fifth counterclaims. The Motion is DENIED as to the first and sixth counterclaims. The motion is GRANTED in part and DENIED in part as to the eighth counterclaim. The Abselets shall have leave to amend their countercomplaint. The amended countercomplaint, if any, shall be filed by February 15, 2019 unless the parties agree otherwise.

###

Date: January 25, 2019

Maureen A. Tighe
United States Bankruptcy Judge